# 26-780-cv

# United States Court of Appeals

*for the*

# Second Circuit

CITY OF ALMATY, KAZAKHSTAN, BTA BANK JSC,

*Plaintiffs-Appellees,*

– v. –

FELIX SATER,

*Defendant-Appellant,*

DANIEL RIDLOFF, BAYROCK GROUP INC., GLOBAL HABITAT
SOLUTIONS INC., RRMI−DR LLC, FERRARI HOLDINGS LLC,
MEM ENERGY PARTNERS LLC,

*Defendants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

FELIX SATER
*Defendant-Appellant Pro Se*
725 River Road, Suite 32125
Edgewater, New Jersey 07020
(212) 302-8000
fhs@regency.net

COUNSEL PRESS
A Proceed Service
The Appellate Experts®   (800) 4-APPEAL • (395078)

FREDERICK M. OBERLANDER,

*Intervenor,*

DIANE ARTAL-BURGER,

*Third-Party-Defendant.*

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ... 1

**INTRODUCTION** ... 1

**JURISDICTIONAL STATEMENT** ... 3

**ISSUES PRESENTED** ... 4

**STATEMENT OF THE CASE** ... 5

A. The 2013 transaction and the lawsuit it produced ... 5

B. The Confidential Assistance Agreement and ownership NDA ... 6

C. This action and the two trials ... 8

D. The requested instruction, definitive refusal, and charge ... 9

E. The judgment ... 10

**SUMMARY OF ARGUMENT** ... 11

**STANDARDS OF REVIEW AND PRESERVATION** ... 12

**ARGUMENT** ... 13

**POINT I — THE DISTRICT COURT APPLIED THE WRONG SAME-ACT RULE; UNDER THE CORRECT RULE, PLAINTIFFS' IDENTIFIED ESTOPPEL THEORIES CANNOT SAVE THE CONVERSION AND UNJUST-ENRICHMENT CLAIMS** ... 13

A. The district court passed upon the legal question, and *Dupree* permits review of that question ... 14

B. Plaintiffs' identified categories do not satisfy the correct legal standard ... 16

C. The bid and shell structures were the alleged wrong, not later concealment ... 17

D. *General Stencils*, *Farkas*, and *Su* involved affirmative concealment distinct from the liability-producing conduct; Plaintiffs identified no comparable subsequent and specific act here ... 20

E. The settlement supplied confidentiality, not a later representation to Plaintiffs ... 22

F. The public action and Garske communication were disclosures, not alleged concealment ... 23

G. The CAA and NDA protected source identity and witness exposure, not the underlying transactions ... 24

H. Any nonconfidential transaction information acquired by Arcanum was subject to ordinary agency principles ... 27

I. The documentary chronology confirms the limited scope of the 2015 agreements ... 28

i

J. Wolf's 2018 statement cannot revive claims that expired in 2016    29

K. The same legal framework governs the other investments; Plaintiffs' three theories fail under the corrected rule    29

L. Certification is warranted only if New York law is unresolved    31

M. Relief on Point I    31

**POINT II — IN THE ALTERNATIVE, THE REFUSAL TO INSTRUCT THE JURY ON NEW YORK'S SAME-ACT LIMITATION REQUIRES A NEW TRIAL**    32

A. New York requires deception separate from and subsequent to the wrong    33

B. Sater requested the correct instruction, and the court definitively refused it    34

C. The full charge-conference sequence did not intentionally relinquish the refused same-act request    35

D. Rule 51 preserved the refused request    36

E. The charge addressed causation, not legal eligibility    37

F. The unallocated estoppel finding provides no assurance that the jury relied on conduct that could support estoppel    39

G. The first new-trial ruling confirms the materiality of the omitted limitation    42

**CONCLUSION**    43

**CERTIFICATE OF COMPLIANCE**    44

**TABLE OF AUTHORITIES**

**CASES**

*Abbas v. Dixon*, 480 F.3d 636 (2d Cir. 2007)    16

*AmTrust North America, Inc. v. Insurance Specialty Group LLC*, 244 A.D.3d 467 (1st Dep't 2025)    18, 31

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002)    14

*Bauer v. CS-Graces, LLC*, 48 A.D.3d 922, 852 N.Y.S.2d 416 (3d Dep't 2008)    27

*Bruneau ex rel. Schofield v. South Kortright Central School District*, 163 F.3d 749 (2d Cir. 1998)    40

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42 (2d Cir. 2014)    40

ii

*CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368 (2d Cir. 2025) ............ 13, 37

*City of Almaty, Kazakhstan v. Sater,* 503 F. Supp. 3d 51 (S.D.N.Y. 2020) ............ 5, 8, 17, 22

*City of Almaty, Kazakhstan v. Sater,* No. 19-cv-2645, 2025 WL 2263814 (S.D.N.Y. Aug. 6, 2025) ............ 5

*Corsello v. Verizon New York, Inc.,* 18 N.Y.3d 777 (2012) ............ 3, 11, 17, 31, 33

*Dupree v. Younger,* 598 U.S. 729 (2023) ............ 2, 12, 14, 15, 32

*Estate of Boyle v. Smith,* decided with *Zumpano v. Quinn,* 6 N.Y.3d 666 (2006) ............ 19

*Farkas v. Farkas,* 168 F.3d 638 (2d Cir. 1999) ............ 11, 20

*Fitzgerald v. Barnstable School Committee,* 555 U.S. 246 (2009) ............ 40

*General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 219 N.E.2d 169 (1966) ............ 11, 20

*Gordon v. New York City Board of Education,* 232 F.3d 111 (2d Cir. 2000) ............ 40

*Hathaway v. Coughlin,* 99 F.3d 550 (2d Cir. 1996) ............ 39

*Hoffer v. Tellone,* 128 F.4th 433 (2d Cir. 2025) ............ 13, 36

*Keeling v. Hars,* 809 F.3d 43 (2d Cir. 2015) ............ 12, 15

*Koch v. Christie's International PLC,* 699 F.3d 141 (2d Cir. 2012) ............ 29

*Koenigsberg v. Board of Trustees of Columbia University,* No. 24-2519-cv, 2025 WL 1540252 (2d Cir. May 30, 2025) (summary order) ............ 19

*Koral v. Saunders,* 36 F.4th 400 (2d Cir. 2022) ............ 14, 17, 21, 31, 34

*Lore v. City of Syracuse,* 670 F.3d 127 (2d Cir. 2012) ............ 13

*Meyer v. Seidel,* 89 F.4th 117 (2d Cir. 2023) ............ 23, 26, 29

*Murray v. UBS Securities, LLC,* 128 F.4th 363 (2d Cir. 2025) ............ 36

*Ortiz v. Jordan, 562 U.S. 180 (2011)* ............ 12

*Pearl v. City of Long Beach,* 296 F.3d 76 (2d Cir. 2002) ............ 24

*Rose v. New York City Board of Education,* 257 F.3d 156 (2d Cir. 2001) ............ 36

*Ross v. Louise Wise Services, Inc.,* 8 N.Y.3d 478, 868 N.E.2d 189 (2007) — 3, 11, 14, 17, 22, 23, 30, 31, 33, 34

*Simcuski v. Saeli,* 44 N.Y.2d 442 (1978) — 33

*Skiff-Murray v. Murray,* 17 A.D.3d 807, 793 N.Y.S.2d 243 (3d Dep't 2005) — 27

*Su v. Hwang,* No. 24-0653, 2025 WL 1983182 (2d Cir. July 17, 2025) (summary order) — 20

*Tri-County Mall Investors LLC v. Sater,* Index No. 654361/2013 (N.Y. Sup. Ct. N.Y. Cnty.) — 5

*United States v. Graham,* 51 F.4th 67 (2d Cir. 2022) — 13, 36

*United States v. Harrell,* 268 F.3d 141 (2d Cir. 2001) — 14

*Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.,* 546 U.S. 394 (2006) — 32

*Uzoukwu v. City of New York,* 805 F.3d 409 (2d Cir. 2015) — 13

*Veal v. Geraci,* 23 F.3d 722 (2d Cir. 1994) — 28

*Zoe G. v. Frederick F.G.,* 208 A.D.2d 675 (2d Dep't 1994) — 33

*Zumpano v. Quinn,* 6 N.Y.3d 666, 849 N.E.2d 926 (2006) — 1, 16, 19, 23, 33

**STATUTES AND RULES**

28 U.S.C. § 1291 — 4

28 U.S.C. § 1332(a) — 3

28 U.S.C. § 2106 — 31

N.Y. C.P.L.R. § 214(3) — 1

Fed. R. App. P. 4(a)(1)(A), (a)(7) — 4

Fed. R. App. P. 26.1 — 1

Fed. R. App. P. 32(a)(5) — 44

Fed. R. App. P. 32(a)(6) — 44

Fed. R. App. P. 32(f) — 44

Fed. R. Civ. P. 50 — 12, 15

Fed. R. Civ. P. 51(d)(1)(B) — 13, 36

22 N.Y.C.R.R. § 500.27 — 31

2d Cir. Local Rule 27.2 — 31

2d Cir. Local Rule 32.1(a)(4)(A) — 44

## OTHER AUTHORITIES

Fed. R. Civ. P. 51 advisory committee's note to 2003 amendment     36

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, appellant Felix Sater (*Sater*) states that he is an individual and not a corporate entity. No corporate disclosure statement is required.

## INTRODUCTION

This appeal arises from conversion and unjust-enrichment claims tried twice, despite having accrued in 2013 and, under N.Y. C.P.L.R. § 214(3), expired in 2016 absent equitable estoppel. [SPA-109.] In its ruling on summary judgment, the district court correctly stated New York's rule regarding equitable estoppel: Plaintiffs could not rely on the same conduct underlying their claims to claim equitable estoppel, and had to identify a distinct act of deception or concealment for such a claim. But the court then treated deception used to carry out the alleged conversion and unjust enrichment as "distinct" merely because deception is not a formal element of conversion. That elements-versus-conduct rule is the central legal error on appeal.

New York law asks whether the asserted concealment was separate from, and subsequent to, the conduct sued upon—not whether deception appears on the elements list of the underlying tort. Otherwise, as the New York Court of Appeals cautioned, "the statute of limitations would rarely be available as a defense." *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006). The district court's rule would erase

1

the same-act limitation for conversion: the taking itself would supply the claim, and the stealth used to accomplish the taking would automatically supply estoppel. That purely legal rule, and the textual scope of the settlement, CAA, and NDA, are reviewable under *Dupree* without reweighing trial evidence.

Using the categories identified in Plaintiffs' summary-judgment opposition, the transaction mechanics were: (1) the alleged 2013 wrong; (2) the confidential settlement of the 2013 wrong not later represented to Plaintiffs; and (3) the 2015 agreements (CAA and NDA) that protected Sater's identity and witness exposure while facilitating information and assistance for Plaintiffs' worldwide recovery effort against Ablyazov and Khrapunov. The NDA did withhold disclosure of Sater's ownership of Litco from Plaintiffs, but it did not make the Tri-County transaction or transaction information confidential. [A-316; A-325-A-326; A-97-A-99; A-84-A-86.]

The judgment cannot stand for two independent reasons.

First, the district court's summary-judgment ruling rested on a reviewable error of law. Deception used to accomplish conversion does not become a separate act merely because deception is absent from conversion's formal elements. The Court can correct that rule and construe the agreements according to their text without resolving the full Garske conversation, subjective diligence, credibility, or post-trial evidentiary sufficiency.

2

Second, Sater's requested jury instruction stated the same threshold limitation imposed by *Ross, Corsello*, and the district court's own summary-judgment opinion. The request was written, definitively refused, and preserved under Rule 51. The verdict-return transcript records only an unallocated estoppel finding under an incomplete definition, so the record provides no assurance that the jury relied on conduct that could support estoppel as defined in New York law.

Sater principally seeks reversal of the denial of summary judgment and remand with instructions to enter judgment for him on the conversion and unjust-enrichment claims. None of Plaintiffs' identified estoppel categories qualifies under the correct same-act rule. Only if the Court concludes that a qualifying estoppel theory survives should it reach Point II and order a new trial under a correct instruction. These limitations arguments do not seek reversal of the money-had-and-received award.

## JURISDICTIONAL STATEMENT

The district court exercised subject-matter jurisdiction under 28 U.S.C. § 1332(a). The plaintiffs are the City of Almaty, Kazakhstan (Almaty), a legal subdivision of the Republic of Kazakhstan, and BTA Bank JSC (BTA), a joint stock company organized under Kazakhstan law with its headquarters in Almaty. [A-129.] The Second Amended Complaint alleged complete diversity of citizenship and an amount in controversy exceeding $75,000. [A-130.]

3

This Court has jurisdiction under 28 U.S.C. § 1291. On February 27, 2026, the district court signed ECF 832, directing entry of a default judgment against Ferrari Holdings LLC. [A-468-A-477.] The court also signed ECF 833, the judgment against Sater and the other appearing defendants, from which Sater appeals. [A-478-A-483.] ECF 832 directed the Clerk to enter the Ferrari judgment "on the same day as the judgment against the remaining defendants so that all judgments are final and the case is closed." [A-477.] The Clerk entered both on March 2, 2026. [A-13-A-14.]

Sater filed his notice of appeal from ECF 833 on March 27, 2026, within 30 days after entry. [A-14; A-484.] Fed. R. App. P. 4(a)(1)(A), (a)(7).

## ISSUES PRESENTED

1.      Whether the district court applied the wrong New York-law standard by treating deception used to accomplish the alleged conversion as a distinct act merely because deception is not a formal element of conversion.

2.      Whether the district court erred by refusing Sater's preserved request to instruct the jury that a plaintiff invoking equitable estoppel "may not rely on the same act that forms the basis for the claim" and must identify "a distinct act of deception or concealment," and by charging the jury without that threshold limitation.

4

## STATEMENT OF THE CASE

This is an appeal from a final judgment entered March 2, 2026 in the United States District Court for the Southern District of New York (Koeltl, J.), following two jury trials. The district court's opinion on the motion to dismiss is reported at *City of Almaty, Kazakhstan v. Sater*, 503 F. Supp. 3d 51 (S.D.N.Y. 2020). Its opinion denying summary judgment is reported at 2025 WL 2263814 (S.D.N.Y. Aug. 6, 2025). Its remaining decisions are unreported.

### A.     The 2013 transaction and the lawsuit it produced.

Plaintiffs alleged, and the verdict underlying the judgment reflects, that in 2013 Sater participated in the purchase and resale of a note on the Tri-County Mall in Cincinnati, financed in part with funds provided by Ilyas Khrapunov, and that $36,073,196 in resale proceeds was transferred to an account controlled by Sater, in addition to receiving proceeds from several other business transactions the same year. [A-345; A-370.] The merits of that liability determination are not the subject of this limitations appeal.

On December 19, 2013, the entity that had held the proceeds sued Sater in New York Supreme Court to recover them. *Tri-County Mall Investors LLC v. Sater*, Index No. 654361/2013. [A-307; A-22-A-37]. Nicolas Bourg filed a sworn affidavit in that action describing the transaction the same day. [A-311; A-15-A-21;

5

A-388.] The action was resolved by a confidential settlement under which Sater returned $20 million and retained the balance. [A-38-A-83.]

The alleged diversion formed the Tri-County component of the claims here. It was complete in 2013 and produced a public lawsuit naming Sater that same year.

**B. The Confidential Assistance Agreement and ownership NDA.**

In early 2015, Robert Wolf approached Latham & Watkins, then representing Almaty, offering the services of his client Litco LLC to assist in recovering funds. [A-390.] Latham signed a nondisclosure agreement, after which Wolf disclosed that Sater was Litco's sole member. [A-390.] Latham declined the engagement. [A-390.] Wolf then approached Peder Garske of Arcanum (Asia) Limited, the investigative firm working with Plaintiffs. [A-390-A-391.]

The Confidential Assistance Agreement ("CAA") is dated June 12, 2015. [A-84-A-95].  It recites that Arcanum was seeking to locate, seize, and recover billions of dollars in worldwide assets of Ablyazov, Khrapunov, and controlled entities. [*Id.,* Recital B.] Its structure reflects a substantial, performance-based engagement designed to obtain information and assistance from a source positioned to provide first-hand knowledge relevant to that worldwide recovery effort. Litco's assistance was rendered "to Arcanum, as agent to Kazakhstan, Almaty and BTA." [*Id.* § 1.] Plaintiffs agreed to monthly payments, expenses, and sixteen percent of covered recoveries, "regardless of whether" they had previous knowledge of the

6

information provided. [*Id*. §§ 2, 3(a), 4.] The agreement required monthly reports and included an express warranty that Litco would not produce any potential witness with an ownership interest in Litco to Arcanum. [*Id*. §§ 6(e), 9.]

In July 2015, Litco and Arcanum entered a separate Confidentiality and Non-Disclosure Agreement ("NDA"). [A-96-A-99]. Its recitals state that Litco desired to keep confidential the identities of its members and other persons holding ownership interests in it. Section 1 defines "Confidential Information" as those ownership identities when disclosed to Arcanum. Section 2 prohibits disclosure of that defined information and the proffering of a Litco owner as a potential witness. [Id. §§ 1–2.] The agreement does not identify the Tri-County transaction, the alleged diversion, the 2013 lawsuit or its settlement, or transaction information generally, as confidential. [Id. §§ 1–2, 10.]

Sater then met with Wolf and Garske. [A-392.] The parties dispute the full content and exact timing of the meeting, but Plaintiffs acknowledge that Sater "alluded to the Tri-County Mall transaction." [A-323.] The timing dispute does not affect the NDA issue: if the meeting preceded the NDA, no NDA restriction yet existed; if it followed, the NDA protected only Litco ownership identities, not Tri-County transaction information. [A-96-A-99.]

7

### C. This action and the two trials.

Plaintiffs filed this action on March 25, 2019. [A-308.] Following a motion to dismiss, three claims proceeded: conversion against Sater, and unjust enrichment and money had and received against all defendants. 503 F. Supp. 3d at 68. Plaintiffs do not dispute that conversion and unjust enrichment "are governed by a three-year statute of limitations and accrued when Defendants converted funds or were unjustly enriched." [A-349.]

Sater moved for summary judgment on limitations grounds. [A-285-A-306]. The motion was denied. [A-385-A-413]. In opposing summary judgment, Plaintiffs identified their concealment theories as the alleged "overarching strategy," the confidential settlement, and the 2015 Litco CAA and NDA conduct. [A-316; A-325-A-326.] The same filing separately described the public 2013 lawsuit, Sater's statements to Garske, and the October 2015 crossclaims Sater assisted Plaintiffs in filing in *City of Almaty, Kazakhstan, et ano. v. Mukhtar Ablyazov, et al.*, No. 15-CV-5345 as "three factual propositions on which Sater relies" to defeat equitable estoppel. [A-326.] Sater's reply argued that those propositions showed disclosure, notice, and the absence of a qualifying later act—not subsequent concealment. [A-377-A-381.]

The first trial began June 10, 2024. The jury found for Plaintiffs and found that the claims accrued in 2013. [A-261-A-262.] On January 15, 2025 the district

court granted a new trial on conversion and unjust enrichment, holding that the accrual instruction was plain error because it "contravene[d] an established rule of law." [A-270.] The court observed that, correctly instructed, if the claims accrued in 2013, then "… the limitations period to bring conversion and unjust-enrichment claims expired in 2016," and that Plaintiffs "brought this action in 2019, about three years too late." [A-271.] The money-had-and-received verdict, governed by a six-year period, was left undisturbed. [A-283.]

The second trial began September 29, 2025 on conversion and unjust enrichment. The court's pre-deliberation reading used "equitable estoppel." [A-464.] The verdict-return transcript records a "yes" answer to Question 1(b), although the reporter's text substituted "collateral estoppel" for "equitable estoppel." [A-466-A-467.] The answer did not identify the conduct supplying estoppel. Equitable estoppel was decided by the second jury alone.

**D. The requested instruction, definitive refusal, and charge.**

On October 7, 2025 Plaintiffs proposed an equitable-estoppel instruction. [A-425-A-427; A-428-A-436]. Sater responded the same day, quoting the district court's summary-judgment opinion and proposing an instruction drawn from it, including: "In invoking equitable estoppel, the plaintiff may not rely on the same act that forms the basis for the claim and must instead point to a distinct act of deception or concealment." [A-440.] The letter flagged the request as critical.

9

At the charge conference the next morning, the court definitively refused that request. [A-446-A-448]. The later sequence included discussion of Plaintiffs' diligence language, counsel's agreement to the resolved charge language, approval of a converse, closure of the conference, and confirmation that the charge and verdict sheet had been inspected. [A-449-A-455; A-457-A-459; A-460; A-465]. None expressly identified or withdrew the same-act request the court had rejected as legally improper. The delivered charge contained no same-act or distinct-act limitation, and the court's pre-deliberation reading of the special-verdict question directed the jury to decide estoppel only "as equitable estoppel is defined for you in the Court's instructions." [A-462; A-464].

**E. The judgment.**

On February 27, 2026, the district court signed the judgment, which was entered on March 2, 2026. It awards against Sater $26,221,387.00 on conversion with $30,485,055.22 in prejudgment interest and $3,000,000 in punitive damages; $16,083,426.67 on unjust enrichment with $18,698,635.09 in interest; and $504,213.33 on money had and received with $586,198.97 in interest—a total of $95,578,916.28. [A-478-A-482.] The limitations arguments in this appeal do not challenge the money-had-and-received award.

## SUMMARY OF ARGUMENT

New York permits equitable estoppel of a limitations defense only on "an act of deception, separate from the ones for which they sue." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 789 (2012). The qualifying conduct must follow the underlying wrong and must induce delayed filing; "mere silence or failure to disclose the wrongdoing is insufficient." *Ross v. Louise Wise Services, Inc.*, 8 N.Y.3d 478, 491 (2007).

**Point I.** The district court applied the wrong same-act rule at summary judgment. Deception used to accomplish the alleged conversion did not become separate concealment merely because deception is not a formal element of conversion. *General Stencils, Farkas,* and *Su* (cited below) involved affirmative concealment functionally distinct from the conduct producing liability. The 2013 settlement supplied confidentiality to the economic terms reached by the parties thereto but did not remove the underlying lawsuit from the public record. The CAA and NDA facilitated assistance to Plaintiffs' recovery effort while protecting source identity and witness exposure, but they did not make the underlying transactions confidential.

**Point II.** In the alternative, the second jury was never told New York's threshold same-act limitation. Sater requested it in the words of the district court's own summary-judgment opinion, and the court definitively refused it. The charge

11

addressed causation, not which conduct could legally support estoppel. Because the verdict-return transcript records only an unallocated estoppel finding under that incomplete definition, the omission was prejudicial.

Point I permits this Court to decide the elements-versus-conduct rule and construe the agreements according to their text without resolving disputed testimony. Plaintiffs offered the same three concealment theories across the investments, and none qualifies under the corrected rule. The Court should therefore direct judgment for Sater on conversion and unjust enrichment. If, however, the Court concludes that any qualifying theory remains, Point II requires a new trial on that surviving component.

## STANDARDS OF REVIEW AND PRESERVATION

Under *Ortiz v. Jordan*, a party ordinarily may not appeal after a full trial a summary-judgment denial based on evidentiary sufficiency. 562 U.S. 180, 184 (2011). *Dupree v. Younger* preserves the distinct class of purely legal issues—those resolvable without disputed facts—without Rule 50 renewal. 598 U.S. 729, 735–36 (2023); *Keeling v. Hars*, 809 F.3d 43, 47 (2d Cir. 2015). Point I is limited to the district court's same-act rule, the legal character of the categories identified by Plaintiffs' opposition, and interpretation of the agreements to the extent governed by their text. Sater does not ask this Court to resolve disputed testimony, subjective motive, diligence, credibility, or post-trial evidentiary sufficiency.

12

A claim that jury instructions misstated or incompletely stated the governing law is reviewed *de novo*, and reversal is required when the error was prejudicial in light of the charge as a whole. *Uzoukwu v. City of New York*, 805 F.3d 409, 412 (2d Cir. 2015); *Lore v. City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012). A requested instruction warrants relief when it correctly states the law, is supported by the issues and evidence, is not substantially covered by the charge, and its omission prejudiced the requesting party.

The same-act request was submitted in writing and definitively refused before the charge was read. Rule 51(d)(1)(B) therefore did not require redundant renewal. *Hoffer v. Tellone*, 128 F.4th 433, 437 (2d Cir. 2025). Waiver requires the "intentional relinquishment or abandonment of a known right." *United States v. Graham*, 51 F.4th 67, 80 (2d Cir. 2022). Unlike the express wholesale withdrawal in *CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 405–06 (2d Cir. 2025), no later statement here expressly identified or withdrew the same-act request.

## ARGUMENT

### POINT I

**THE DISTRICT COURT APPLIED THE WRONG SAME-ACT RULE; UNDER THE CORRECT RULE, PLAINTIFFS' IDENTIFIED ESTOPPEL THEORIES CANNOT SAVE THE CONVERSION AND UNJUST-ENRICHMENT CLAIMS**

Point I seeks review only of legal rulings unaffected by the trial record: the district court's tort-elements exception, the legal classification of the transaction

13

mechanics, the construction of the settlement, CAA, and NDA, and the effect of conduct occurring after limitations expired. Plaintiffs' own opposition identified the categories they advanced as concealment. [A-316; A-325-A-326.] No credibility finding or weighing of the two trial records is requested.

**A. The district court passed upon the legal question, and *Dupree* permits review of that question.**

The district court expressly decided the New York equitable-estoppel rule. It framed the motion under that doctrine [A-386], held that New York law governed [A-400 n.5], quoted *Ross* for the same-act requirement [A-399], and decided whether the conduct Plaintiffs identified could satisfy it. An issue is reviewable when it was "pressed or passed upon below." *United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 132 (2d Cir. 2002).

The labels used in the trial record do not change the issue. New York courts use "fraudulent concealment," "equitable tolling," and "equitable estoppel" without a substantive distinction; "[t]he terminology is a distraction." *Koral v. Saunders, 36 F.4th 400, 409–10 & nn.1–2 (2d Cir. 2022). Sater consistently maintained that limitations barred the claims and that Plaintiffs had not identified legally sufficient later concealment.*

14

Under *Dupree*, a purely legal issue decided at summary judgment merges into the final judgment and remains reviewable without Rule 50 renewal. 598 U.S. at 735–36. *Keeling* applies the same rule in this Circuit and reviews such issues *de novo*. 809 F.3d at 47. The core issue here is legal: whether deception used in accomplishing the alleged tort becomes "distinct" merely because deception is not a formal element of conversion. No trial evidence can alter the district court's announced rule.

Interpretation of the agreements is likewise legal to the extent it turns on their text: the settlement's parties and operative terms; the CAA's designation of Arcanum as agent; and the NDA's definition of "Confidential Information," ownership restriction, witness restriction, and integration clause. No later testimony can rewrite those provisions.

The Court need not decide what else was said during the Garske meeting, what Plaintiffs subjectively knew, whether their overall diligence was sufficient, or any witness's credibility. Those matters are unnecessary to reject the tort-elements exception or construe the documents. If the Court nevertheless concludes that a qualifying estoppel theory survives, Point II supplies the alternative new-trial remedy under the correct instruction.

Even if every disputed question concerning notice, agency, diligence, and the full content of the Garske meeting is reserved, the core legal error remains. No fact developed at trial can make deception "separate" from the conduct sued upon merely

15

because deception is absent from conversion's formal elements. Nor can testimony expand the subjects covered by the written settlement and NDA.

**B. Plaintiffs' identified categories do not satisfy the correct legal standard.**

New York's legal standard requires "subsequent and specific actions by defendants [that] somehow kept them from timely bringing suit." *Zumpano*, 6 N.Y.3d at 674. The asserted conduct also must be legally connected to forbearance. *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007).

Plaintiffs selected three categories as concealment: (1) the alleged overarching strategy, (2) the confidential settlement, and (3) the 2015 Litco/NDA arrangement. [A-316; A-325-A-326.] On Plaintiffs' own description, the first was conduct alleged to accomplish the 2013 transaction, the second supplied confidentiality without a representation to Plaintiffs and furthermore left the underlying lawsuit on the docket in New York County Supreme Court as a matter of public record, and the third protected Litco ownership and witness status rather than any information regarding the underlying transactions Sater engaged in with Khrapunov. The public lawsuit, Garske communication, and crossclaims appeared under a separate heading as the "three factual propositions on which Sater relies." [A-326.]

16

That categorization defines the legal issue decided at summary judgment. Plaintiffs cannot transform Sater's evidence of disclosure and notice into concealment acts that they themselves never advanced as such.

**C. The bid and shell structures were the alleged wrong, not later concealment.**

Plaintiffs' first theory was Sater's alleged "overarching strategy to obscure the source of the funds and specific fraudulent misrepresentations designed to evade detection." [A-316; A-325.] The district court identified the shell structures and the fraudulent bid used in the April 2013 Tri-County transaction as distinct because conversion does not require deception. 503 F. Supp. 3d at 68; [A-104; A-123; A-399; A-447-A-449.]

Neither was separate from the conduct sued upon. The bid was the asserted instrument by which the note was acquired, and the structures were the asserted means by which the proceeds moved. Both were complete when the alleged transaction was complete. Equitable estoppel is triggered by conduct "after the initial wrongdoing." *Ross*, 8 N.Y.3d at 491. "Concealment of fraud must entail more than the fraud itself, unconfessed." *Koral*, 36 F.4th at 410.

The elements-based approach substitutes one question for another. *Ross* does not ask whether deception is an element of the claim pleaded. It asks whether the act relied on is later conduct intended to conceal the former tort. *Corsello* asks whether

17

there is "an act of deception, separate from the ones for which they sue." 18 N.Y.3d at 789. The two inquiries diverge precisely when a tort can be committed by stealth.

The district court's rule would erase the same-act limitation for conversion: the taking would supply the claim, and the stealth used to accomplish the taking would automatically supply estoppel. The *AmTrust* case, a pleading-stage decision, confirms the conduct-specific method. Within a single contract claim, the First Department permitted estoppel only for breaches as to which the asserted concealment was separate and distinct, while rejecting estoppel where concealment was "the same act forming the basis of the underlying substantive cause of action." *AmTrust North America, Inc. v. Insurance Specialty Group LLC*, 244 A.D.3d 467, 468–69 (1st Dep't 2025). Its point is methodological, not factual, namely, that one must compare the asserted concealment with the conduct underlying the particular claim or breach, not with an abstract elements list.

At the charge conference, the court said the requested limitation had been "specifically rejected by Judge Nathan." [A-447.] That history pinpoints rather than resolves the legal issue. Judge Nathan first stated the governing dividing line: "whether deceptive conduct apart from the underlying wrongdoing could fairly be said to have caused the plaintiff's failure to timely file." [A-122.] She then treated the "corporate shell game and fraudulent bid" as distinct because "the claim rests on taking the money, not hiding it." [A-123.] The first formulation asks whether the

18

asserted deception was conduct apart from the wrongdoing; the second turns on whether deception is a formal element of the claim. That elements-based step is the legal error presented here.

The pleading-stage opinion then said Plaintiffs' "thin" allegations suggested "a broad pattern of deceptive conduct" designed to prevent timely suit. [A-124.] But *Zumpano* rejected estoppel in *Estate of Boyle v. Smith* despite allegations that defendants had engaged in a "corrupt campaign and a pattern of concealment" over decades: the plaintiffs had not alleged any "specific misrepresentation to them" or any "new separate and subsequent acts of wrongdoing." 6 N.Y.3d at 672–75. Labels such as "pattern," "scheme," or "campaign" therefore do not replace the required act-by-act comparison. The question remains whether the asserted deception was conduct apart from the alleged taking—not whether the allegations as a whole sounded deceptive.

The district court applied the same method. It treated deception used to accomplish conversion as distinct solely because deception is not a required element of conversion.

No New York appellate decision has adopted the exception applied below. *Koenigsberg v. Board of Trustees of Columbia University* declined to recognize an analogous self-concealing-act theory without New York appellate guidance. No. 24-2519-cv, 2025 WL 1540252, at *3 (2d Cir. May 30, 2025) (summary order).

19

**D.** *General Stencils, Farkas,* **and** *Su* **involved affirmative concealment distinct from the liability-producing conduct; Plaintiffs identified no comparable subsequent and specific act here.**

The district court relied on *General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125 (1966), reasoning that the bookkeeper used deceptive records "in the course of stealing." [A-447-A-448]. But the court's own summary-judgment opinion stated the operative distinction correctly: fraudulent accounting practices concealed the losses caused by theft. [A-399.] The false bookkeeping entries were affirmative records masking the losses, not silence or stealth inherent in taking the cash.

*Farkas v. Farkas* confirms the functional distinction. Converted art proceeds were routed through a fictitious loan charade and supported by dubious documents designed to make the claimant believe the money had been used for business or family expenses; she did not know what had happened to the money. 168 F.3d 638, 642–44 (2d Cir. 1999). The concealment was a continuing false structure directed at her understanding of the completed conversion.

*Su v. Hwang* elaborates on this line of reasoning. The post-trial findings described an "elaborate scheme" extending for years: persistent inquiries were ignored; a materially misleading ownership statement was used; identities and contact information were withheld; and the claimant was omitted from litigation concerning the property. No. 24-0653, 2025 WL 1983182 (2d Cir. July 17, 2025)

20

(summary order). Those acts allegedly made timely suit impossible and continued during the limitations period.

The categories Plaintiffs selected are legally different. They did not include a later false ledger, fictitious loan, fabricated Tri-County ownership instrument, or continuing false account of a completed conversion of the kind present in those cases. A public complaint named Sater over the transaction in 2013, Garske knew he was meeting Sater in 2015, and—even on Plaintiffs' admitted minimum—Sater alluded to the Tri-County Mall transaction; the NDA withheld disclosure of Sater's ownership of Litco, not his identity as the person in the meeting or the existence of the Tri-County transaction. [A-323; A-405.]

*Koral* illustrates the same distinction from the other direction. It rejected tolling for an overarching fraud concerning disclosed assets but remanded as to a later, undisclosed sale that created a separate $650,000 cash asset and was followed by false ownership testimony. 36 F.4th at 413–15. The Tri-County mall lawsuit settlement resolved already-public litigation, created no new concealed transaction, made no representation to Plaintiffs, and did not retract the public complaint or Bourg affidavit.

21

**E. The settlement supplied confidentiality, not a later representation to Plaintiffs.**

The district court framed the settlement issue as whether "the existence of the confidential settlement agreement was part of a deceptive scheme by Sater to prevent the plaintiffs from becoming aware of their claims against him." [A-404.] That formulation treated the existence and confidentiality of the agreement—not a later representation to Plaintiffs—as potentially qualifying concealment. The agreement's text resolves that legal question.

Plaintiffs invoked the confidentiality of the settlement resolving the 2013 action. [A-316; A-325-A-326.] The district court had already held that "a confidential settlement that prevents one's wrongdoing from coming to light does not, by itself, amount to the sort of active concealment necessary for equitable estoppel." 503 F. Supp. 3d at 68. The complete agreement confirms the limited legal point: its payment and confidentiality provisions resolved the Tri-County dispute; they did not purport to communicate with Plaintiffs. [A-38-A-83.]

The settlement was between Sater and Tri-County Mall Investors LLC. Its terms made no representation to Plaintiffs, imposed no obligation directed to them, and did not remove or alter the public complaint or Bourg affidavit. Confidentiality did not erase those disclosures and did not, by itself, become the later act required by *Ross*.

22

New York requires a later misrepresentation "for the purpose of concealing the former tort," and silence is insufficient. *Meyer v. Seidel*, 89 F.4th 117, 131 (2d Cir. 2023) (quoting *Ross*). A wrongdoer has no duty to make a public confession. *Zumpano*, 6 N.Y.3d at 674. Classifying the agreement by its text does not require a finding about subjective diligence or historical state of mind.

**F. The public action and Garske communication were disclosures, not alleged concealment.**

On December 19, 2013, TCMI sued Sater by name to recover the same Tri-County proceeds, and Bourg filed a sworn affidavit describing the transaction. [A-307-A-311; A-22-A-37; A-15-A-21.] Plaintiffs admitted that the documents were available on the New York Supreme Court's public filing website "as of today's date," while expressly disputing that they had been available "[a]t all times." [A-351.] These were facts Sater offered to defeat estoppel. Plaintiffs' opposition expressly categorized the lawsuit as one of the "three factual propositions on which Sater relies." [A-326.]

The public filing is not offered as a rule that every public record automatically charges every plaintiff with knowledge. The narrower point is categorical: the 2013 complaint and Bourg affidavit were disclosures, not later acts of concealment by Sater.

23

The Court need not decide what the filing established about Plaintiffs' knowledge or diligence. It need only recognize that the filing was not concealment. The Garske communication is similarly limited: whatever else the recording may show, Plaintiffs admit that Sater referred to Tri-County before limitations expired. [A-323.] That admitted minimum means the reference itself was not an act concealing the existence of Tri-County. Any dispute about what further inquiry it should have prompted may be left unresolved.

*Pearl v. City of Long Beach* reinforces the distinction between concealing a cause of action and later discovery of stronger proof. 296 F.3d 76, 83–85 (2d Cir. 2002). Estoppel does not continue merely because Plaintiffs later assembled more complete evidence.

**G. The CAA and NDA protected source identity and witness exposure, not the underlying transactions.**

Plaintiffs' remaining theory was that the Litco arrangement was "intended to conceal [Sater's] identity from Plaintiffs." [A-326.] The NDA prohibited Arcanum from disclosing Sater's ownership of Litco, including to Plaintiffs, and from proffering a Litco owner as a witness. Section 1 nevertheless defined "Confidential Information" only as ownership identities, not the Tri-County transaction or transaction information, and Section 10 made the writing final as to that limited subject. [A-97-A-99.]

24

The NDA therefore withheld a source relationship, not the identity of the person Garske was meeting or the existence of the person publicly named in the 2013 Tri-County action. It did not make Tri-County, the alleged diversion, the settlement, or transaction information confidential. Source-identity protection is not automatically a later act concealing the former tort.

The 2015 agreements performed complementary functions. The CAA, dated June 12, 2015, required Litco to provide information and assistance "to Arcanum, as agent to Kazakhstan, Almaty and BTA" in a worldwide effort directed at assets of Ablyazov, Khrapunov, and controlled entities. [A-84-A-86.] The NDA protected the ownership identity and potential witness exposure of the person behind that source. It did not prohibit Arcanum from transmitting nonconfidential transaction information to Plaintiffs.

Trial testimony supplied consistent context: the source-protection concern involved exposure to persons aligned with Ablyazov or Khrapunov and the risk of producing Sater as a witness. [A-255-A-256; see A-257]. The Court need not resolve subjective motive to construe the agreements. The testimony corroborates the textual distinction: ownership identity and witness exposure were protected, but transaction information was not.

Protecting a source from exposure to the targets of an asset-recovery investigation may require withholding the source's ownership identity from the

25

principals. That is not the same legal act as concealing the underlying transaction from the investigators conducting the recovery effort.

That distinction separates this case from *Su*. There, identities and contact information were affirmatively withheld from a claimant trying to locate the person to sue, and the claimant was omitted from property litigation. Here, the withheld fact was Sater's ownership of a 2015 contracting entity. The NDA did not conceal his identity from Garske, did not prohibit investigation of Tri-County, and did not prevent service of a claim against the person publicly named in 2013.

The chronology likewise requires no diligence finding. The CAA is dated June 12, 2015 and contains an ownership warranty, substantial monthly obligations, a recovery share, and reporting requirements. [A-85-A-91.] The separate ownership NDA followed in July 2015. [A-96-A-99]. Nothing in either agreement made transaction information confidential.

This context is not offered to establish what Plaintiffs subjectively knew. It establishes the narrower legal point that the 2015 arrangement was structured to obtain information and assistance in the recovery effort while protecting the source's identity and witness status. *Meyer* requires a later act intended to conceal the former tort. 89 F.4th at 131. The NDA's explicit terms do not cover the underlying transactions.

26

**H. Any nonconfidential transaction information acquired by Arcanum was subject to ordinary agency principles.**

The summary-judgment court held that imputation "will turn on what exactly Sater disclosed to Garske," which was disputed. [A-405.] Point I does not ask the Court to decide that factual dispute. The agency point is conditional: if Arcanum acquired material, nonconfidential transaction information within the scope of its engagement, the NDA did not bar transmitting that information and ordinary imputation principles apply.

The CAA repeatedly states that Arcanum acted for Plaintiffs: assistance was rendered "to Arcanum, as agent to Kazakhstan, Almaty and BTA"; each Plaintiff confirmed Arcanum's authority concerning the agreement's transactions and subject matter; Arcanum warranted authority to obligate them; monthly reports were required; and Plaintiffs used "c/o Arcanum . . . Attention: Peder A. Garske" as their notice address. [A-85-A-95.]

The relevant question is not merely whether an NDA existed. It is whether the NDA imposed a duty not to disclose the particular information at issue. The confidentiality exception is information-specific. *Skiff-Murray v. Murray* separately examined what nonconfidential information the agent obtained. 17 A.D.3d 807, 810 (3d Dep't 2005). *Bauer v. CS-Graces, LLC* imputed knowledge where

27

confidentiality was not shown to cover the particular communications. 48 A.D.3d 922, 925 (3d Dep't 2008).

The Second Circuit likewise imputes material knowledge acquired by an agent within the scope of the relevant representation. *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994). The district court itself recognized that information Arcanum developed through follow-up "could be imputed to the plaintiffs if not covered by the NDA." [A-417.]

Accordingly, the Court can construe the NDA's scope without deciding what was said at the meeting, what follow-up occurred, or what knowledge resulted. The conditional legal point is that transaction information outside the NDA remains subject to ordinary agency principles.

**I. The documentary chronology confirms the limited scope of the 2015 agreements.**

The CAA describes a worldwide recovery engagement: monthly payments, expenses, a recovery share, monthly reports, an agency designation, and an ownership warranty. [A-84-A-91.] Those terms establish the subject and scope of the engagement without requiring this Court to decide what Plaintiffs subjectively knew or whether they possessed every fact necessary to plead a claim.

The documents show that neither the public filing nor the NDA was a legally qualifying act concealing the Tri-County transaction. They are not offered to resolve

28

what Plaintiffs should have known, whether further inquiry was required, or whether every fact necessary to plead a claim had been assembled.

Any broader question requiring disputed evidence may be left for a properly instructed proceeding. The district court's tort-elements rule and the agreements' textual scope remain reviewable legal questions and independently support relief.

### J. Wolf's 2018 statement cannot revive claims that expired in 2016.

Plaintiffs cited Wolf's September 2018 statement to their counsel concerning whether he recalled Sater's Litco interest. [A-364.] Even accepting Plaintiffs' characterization, the statement occurred more than two years after the three-year period expired. Equitable estoppel "does not revive a limitations period that has already expired." *Meyer*, 89 F.4th at 131. A later tolling period likewise cannot delay a deadline that has already run. *Koch v. Christie's International PLC*, 699 F.3d 141, 157 (2d Cir. 2012).

### K. The same legal framework governs the other investments; Plaintiffs' three theories fail under the corrected rule.

The district court observed that the summary-judgment motion focused on Tri-County and "not the four other investments": World Health Networks, Trump SoHo, Syracuse Center, and Creacard. [A-401.] The concealment categories expressly listed in Plaintiffs' opposition did not identify a separate-and-subsequent

29

act tied to each of those investments. They were the same for all investments: an overarching strategy, the Tri-County settlement, and the Litco/NDA arrangement. [A-316; A-325-A-326.] The opposition separately said that the public Tri-County filings did not mention the other transactions and argued that the Garske communication did not reveal a basis for Plaintiffs' claims. [A-329-A-331.]

That documentary point does not ask the Court to reweigh either trial. It identifies the theories Plaintiffs presented at summary judgment. *Ross* requires a separate-and-subsequent act; neither the mechanics of each alleged investment nor a source-identity agreement automatically supplies that act for every investment. The same incomplete instruction then governed the unallocated estoppel finding across the investments.

The corrected rule disposes of the three theories Plaintiffs chose. The overarching strategy consisted of the alleged liability-producing conduct; the Tri-County settlement supplied confidentiality but no subsequent representation or transaction concealed from Plaintiffs; and the Litco/NDA arrangement protected source identity and witness exposure, not the underlying transactions. Because Plaintiffs invoked those same theories across the investments, the absence of transaction-specific allocation does not create a qualifying estoppel act. It requires judgment under the corrected rule.

30

**L. Certification is warranted only if New York law is unresolved.**

The Court need not certify if *Ross, Corsello, AmTrust,* and *Koral* resolve the issue. If the Court instead concludes that New York law genuinely leaves open the district court's proposed tort-elements exception, certification is preferable to affirming on a rule no New York appellate court has adopted. 22 N.Y.C.R.R. § 500.27; Second Circuit Local Rule 27.2.

> *Where the tort sued upon does not require proof of deception, may deception employed in the commission of that tort satisfy New York's requirement that equitable estoppel of a statute-of-limitations defense rest on an act of deception separate from and subsequent to the wrong sued upon?*

**M. Relief on Point I.**

The Court should reverse the denial of summary judgment and remand with instructions to enter judgment for Sater on conversion and unjust enrichment. Sater's motion requested summary judgment and entry of judgment on both claims. [A-285-A-306]. The district court observed that the supporting argument focused on Tri-County rather than the four other investments. [A-401.] But Plaintiffs' opposition supplied the same three concealment theories for equitable estoppel, and none qualifies under the corrected rule. [A-316; A-325-A-326.] That is a legal conclusion based on the summary-judgment record, not a request to reweigh either trial.

Section 2106 authorizes this Court to direct entry of the judgment that should have been entered. 28 U.S.C. § 2106. No reported decision appears to present this

31

precise post-verdict estoppel posture, but the absence of an identical remedial precedent does not limit that statutory authority. At minimum, the Court should direct judgment on every claim or component necessarily disposed of under the corrected rule and vacate the balance.

This is not a sufficiency challenge. It seeks review of legal conclusions that merged into the final judgment under *Dupree*. *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), addresses unrenewed sufficiency challenges and does not bar review of a pure legal issue. *Dupree*, 598 U.S. at 735–36.

Only if the Court concludes that a qualifying estoppel theory survives should it order a new trial on that component under Point II. That sequence respects *Dupree*, preserves the jury's role where a factual issue genuinely remains, and does not make a third trial the default consequence of correcting a dispositive legal error.

## POINT II

### IN THE ALTERNATIVE, THE REFUSAL TO INSTRUCT THE JURY ON NEW YORK'S SAME-ACT LIMITATION REQUIRES A NEW TRIAL

Point II presents a preserved question of law. Sater submitted the requested instruction in writing; the district court definitively rejected it before charging the jury; and the charge did not otherwise communicate New York's same-act limitation. The judgment must therefore be vacated even if equitable estoppel presented a triable issue. The unallocated estoppel finding does not show whether the jury relied on conduct New York law permits or conduct it excludes.

32

**A. New York requires deception separate from and subsequent to the wrong.**

Equitable estoppel applies "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Ross*, 8 N.Y.3d at 491 (quoting *Simcuski v. Saeli*, 44 N.Y.2d 442, 449 (1978)). That inducement standard addresses causation; it does not identify which conduct may supply estoppel. The Court of Appeals first stated the same-act limitation:

> "For the doctrine to apply, a plaintiff may not rely on the same act that forms the basis for the claim—the later fraudulent misrepresentation must be for the purpose of concealing the former tort."

The Court then supplied a further formulation addressing both timing and silence:

> "[T]he uncommon remedy of equitable estoppel . . . is triggered by some conduct on the part of the defendant after the initial wrongdoing; mere silence or failure to disclose the wrongdoing is insufficient." *Id.* at 491 (quoting *Zoe G. v. Frederick F.G.*, 208 A.D.2d 675, 675–76 (2d Dep't 1994)).

*Zumpano* requires "subsequent and specific actions by defendants [that] somehow kept them from timely bringing suit," and calls that causal connection "fundamental." 6 N.Y.3d at 674. The plaintiffs had not alleged any "specific misrepresentation to them" or any "new separate and subsequent acts of wrongdoing." *Id.* at 674–75. *Corsello* denied estoppel because the plaintiffs alleged no "act of deception, separate from the ones for which they sue." 18 N.Y.3d at 789.

33

This Court states the same boundary succinctly: "concealment of fraud must entail more than the fraud itself, unconfessed." *Koral*, 36 F.4th at 410.

The district court knew this. Its summary-judgment opinion states: "In invoking equitable estoppel, the plaintiff 'may not rely on the same act that forms the basis for the claim' and must instead point to a distinct act of deception or concealment." [A-399 (quoting *Ross*).]

**B. Sater requested the correct instruction, and the court definitively refused it.**

Sater's written request reproduced the district court's own formulation:

"In invoking equitable estoppel, the plaintiff may not rely on the same act that forms the basis for the claim and must instead point to a distinct act of deception or concealment." [A-440.]

The sentence appears word for word at page 15 of the summary-judgment opinion. [A-399.] The request was legally correct and directly responsive to the theories in the case: Plaintiffs relied on transaction mechanics, settlement confidentiality, and the Litco arrangement, while Sater maintained that each was either the underlying conduct, legally unrelated confidentiality, or disclosure rather than concealment.

The court rejected the request in an unmistakably definitive ruling:

"So, the requested instruction that the plaintiff may not rely on the same act that forms the basis for the claim, must, instead, point to a distinct

34

act of deception or concealment, would, in fact, not be a proper charge." [A-448].

The reason given was the legal error presented in Point I. The court reasoned that if the underlying tort does not include deception, Plaintiffs may rely on deception "included in the acts" committing that tort, because "conversion, in and of itself, doesn't require deception." [A-447-A-448]. That substitutes the elements of conversion for New York's separate-act inquiry.

**C. The full charge-conference sequence did not intentionally relinquish the refused same-act request.**

After lunch, Schwartz stated that Defendants had "dropped their objection" and that "the language proposed by plaintiffs is acceptable." Snyder answered, "Confirmed." When the court asked whether "the objection is dropped to the plaintiffs' request for the description of equitable estoppel," Snyder responded: "We are content with the instruction that was in plaintiffs' October 7 letter." [A-455.]

Those statements accepted Plaintiffs' proposed description. The preservation argument is narrower: the court had already segregated and definitively rejected Defendants' affirmative same-act addition as "not . . . a proper charge" before moving to "the next three paragraphs." [A-448-A-451.] The later exchange did not expressly identify or withdraw that already-rejected request.

35

Likewise, counsel's later "no issue" statement addressed Instruction 13 as it then stood and requested a converse; it did not identify or abandon the separate requested sentence the court had conclusively removed. [A-457-A-459.] Waiver requires the "intentional relinquishment or abandonment of a known right." *United States v. Graham*, 51 F.4th 67, 80 (2d Cir. 2022).

### D. Rule 51 preserved the refused request.

Rule 51(d)(1)(B) permits assignment of error for "a failure to give an instruction" when the party properly requested it and, unless the court rejected it in a definitive ruling, also objected. The request was written [A-437-A-441], timely, and definitively rejected before the charge. That definitive ruling preserved the failure to give the request unless counsel later intentionally relinquished that particular claim of error.

In *Hoffer*, this Court held that a definitive pre-charge denial preserves a requested instruction without redundant renewal. 128 F.4th at 437. *Murray v. UBS Securities, LLC*, 128 F.4th 363, 367 & n.1 (2d Cir. 2025), confirms that assent to a supplemental formulation does not invariably erase earlier, clearly overruled objections where the record continues to make the party's position clear. The Advisory Committee adopted Rule 51(d)(1)(B) to avoid a "trap for the unwary." Fed. R. Civ. P. 51 advisory committee's note to 2003 amendment; see *Rose v. New York City Board of Education*, 257 F.3d 156, 160 (2d Cir. 2001).

36

*CITGO Petroleum Corp. v. Ascot Underwriting Ltd.* identifies the other side of the line. There counsel expressly said, "we'll withdraw the objections," and never indicated that the objections remained outstanding. 158 F.4th at 405–06. No equivalent express withdrawal occurred here. Read in context, the later words resolved matters still under discussion and confirmed inspection; they did not intentionally relinquish the distinct same-act request the court had conclusively removed from the charge.

### E. The charge addressed causation, not legal eligibility.

The court instructed the jury on equitable estoppel as follows:

"The defendants have alleged an affirmative defense as to which they have the burden of proof. As a defense to the plaintiffs' claims, the defendants have claimed that the plaintiffs failed to bring their lawsuit within the applicable statute of limitations period. A statute of limitations is the maximum time period within which a claim ordinarily must be brought. The statute of limitations for conversion is three years from when Defendant Sater converted the plaintiffs' property. The statute of limitations for unjust enrichment is three years from the act that caused the unjust enrichment to occur. This lawsuit was brought on March 25, 2019.

"While the plaintiffs' claims would otherwise be untimely, the plaintiffs contend that the defendants are equitably estopped from asserting the defense of the statute of limitations. Equitable estoppel allows a plaintiff to pursue a claim that is brought after the statute of limitations has expired, if the plaintiff can prove that the defendant's affirmative wrongdoing produced the delay in commencing the legal proceeding.

"To establish equitable estoppel, the plaintiffs must prove by a preponderance of the evidence that the plaintiffs were induced by fraud,

37

misrepresentations, or deception to refrain from filing the action before the statute of limitations expired.

"The plaintiffs contend that, because the defendants concealed their roles in the transactions and the receipt of the stolen funds, the plaintiffs did not learn, despite diligent investigation, that the defendants had received stolen funds within the limitations period, and as a result, their unjust enrichment and conversion claims are not time-barred. The defendants deny these allegations.

"If you find by a preponderance of the evidence that the plaintiffs were induced by fraud, misrepresentation, or deception to refrain from filing the action before the statute of limitations expired, you must find that the defendants are estopped from arguing the defense of statute of limitations, and that the plaintiffs' claims are timely.

"If you find that the plaintiffs have failed to prove by a preponderance of the evidence that they were induced by fraud, misrepresentation, or deception to refrain from filing the action before the statute of limitations expired, you must find that the claims are untimely." [A-461-A-463].

That inducement standard addresses causation; it does not identify which conduct may supply estoppel. The charge's opening definition stated that affirmative wrongdoing must have "produced the delay." It then instructed that, to establish equitable estoppel, Plaintiffs had to prove that they were "induced by fraud, misrepresentations, or deception," and finally directed the jury to find estoppel if Plaintiffs were "induced by fraud, misrepresentation, or deception." No part of the charge told the jury that Plaintiffs "may not rely on the same act that forms the basis for the claim" and instead had to identify "a distinct act of deception or concealment." [A-440; A-462-A-463.]

38

That omission was especially significant because the charge described Plaintiffs' theory as concealment of Defendants' "roles in the transactions and the receipt of the stolen funds"—the alleged liability-producing conduct itself—without supplying the requested same-act limitation. [A-462.] The omission is not cured by reading the charge as a whole: conduct may cause ignorance or delay and still be legally ineligible because it is the same conduct for which the plaintiff sued.

A finding that conduct caused delay would not answer the question the court refused to submit. The same conduct may cause ignorance, contribute to delay, and still be legally unavailable for equitable estoppel because it is the conduct for which the plaintiff sued. Causation cannot substitute for New York's same-act limitation.

The requested limitation was therefore not redundant and was not substantially covered. The charge omitted the controlling boundary: Plaintiffs could not rely on the same act underlying their claims and instead had to identify a distinct act of deception or concealment. An instruction is erroneous when it does not adequately inform the jury of the governing law. *Hathaway v. Coughlin*, 99 F.3d 550, 552 (2d Cir. 1996).

**F. The unallocated estoppel finding provides no assurance that the jury relied on conduct that could support estoppel.**

The error concerned a threshold limitation Plaintiffs were required to satisfy. An instruction that improperly directs whether a plaintiff has carried its burden is

not harmless when it goes directly to the claim. *Gordon v. New York City Board of Education*, 232 F.3d 111, 115–16 (2d Cir. 2000). The omission prevented the jury from applying a legal restriction at the heart of Sater's limitations defense.

Before deliberations, the court called the document a "special verdict form" and read Question 1(b) as asking whether Sater was estopped "as equitable estoppel is defined for you in the Court's instructions." [A-464.] The verdict-return transcript later recorded a "yes" answer to Question 1(b), although the reporter's text substituted "collateral" for "equitable." [A-466-A-467.] The answer still did not identify the conduct supplying estoppel.

The *Bruneau* case found instructional error harmless only because its particular record made the Court "sufficiently confident that the verdict was not influenced by an error in the jury charge." *Bruneau ex rel. Schofield v. South Kortright Central School District*, 163 F.3d 749, 759–60 (2d Cir. 1998), abrogated on other grounds by *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009). That standard governs here, but this unallocated finding permits no comparable confidence. See *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 50 (2d Cir. 2014).

Unlike *Bruneau*, the record here does not permit confidence that the error was harmless. The verdict-return transcript records a single yes-or-no estoppel finding under an instruction that omitted the same-act limitation. The answer neither

40

identified the act supporting estoppel nor excluded conduct underlying the claims. The jury therefore could have relied on any of the following impermissible theories:

(a) Transaction mechanics. The jury could have treated the shell structures and the fraudulent bid used in the April 2013 Tri-County transaction as sufficient because the court expressly ruled that deception used to commit conversion could supply estoppel. [A-104; A-123; A-447-A-449.] That is the same-act legal question the refused instruction would have required the jury to confront.

(b) Settlement confidentiality. The jury could have treated the existence of a confidential settlement as sufficient even though the agreement supplied no later representation to Plaintiffs and left the public complaint and Bourg affidavit intact.

(c) Litco ownership and NDA. The jury could have treated withholding Sater's ownership of Litco as equivalent to concealment of Sater or the underlying causes of action. It was never required to distinguish source-identity and witness protection in an investigation directed at Ablyazov and Khrapunov assets from a later act concealing the former tort.

(d) Other investments. The same incomplete definition governed World Health Networks, Trump SoHo, Syracuse Center, and Creacard. The concealment categories expressly listed in Plaintiffs' summary-judgment opposition identified no separate-and-subsequent act tied to each investment, yet the form did not require the jury to identify one.

41

(e) Mere nondisclosure or post-expiration conduct. The charge did not tell the jury that silence is insufficient or that conduct occurring in 2018 could not induce failure to file by 2016.

Point II is alternative to the judgment requested in Point I. If the Court concludes that a qualifying estoppel theory survives, the unallocated finding gives no assurance that the jury selected that theory rather than a route New York law excludes. A correctly instructed new trial is therefore required on any surviving component.

**G. The first new-trial ruling confirms the materiality of the omitted limitation.**

The first jury received an accrual instruction that "contravene[d] an established rule of law." [A-270.] Although no party objected, the district court granted a new trial because the error affected substantial rights and went "to the very essence of the case." [A-271-A-272.]

The point is not that the two instructional errors were identical. It is that the district court already recognized in this very case that an instruction misstating the New York rule controlling whether these claims were timely went "to the very essence of the case." The second charge omitted the threshold limitation determining which conduct could rescue claims filed three years after limitations expired. And unlike the first error, this one was expressly identified, correctly stated, and

42

definitively preserved before the jury was charged. The district court stated the governing limitation at summary judgment, enforced New York limitations law by granting the first new trial, and then refused to give the second jury the limitation it had itself identified.

## CONCLUSION

For the foregoing reasons, Sater respectfully requests that this Court:

(1) Reverse the denial of summary judgment and remand with instructions to enter judgment for Sater on the conversion and unjust-enrichment claims;

(2) At minimum, direct entry of judgment on every claim or component necessarily disposed of under the corrected rule and vacate the balance;

(3) Only if a qualifying estoppel theory survives, order a new trial on that component because Sater preserved his request and the second jury was instructed without New York's same-act limitation; and

(4) Only if the Court concludes that the New York-law question identified in Point I.L is genuinely unresolved, certify that question to the New York Court of Appeals.

43

Dated: New York, New York

August 3, 2026

Respectfully submitted,

/s/ FELIX SATER

**FELIX SATER**

Appellant pro se

725 River Road, Suite 32125

Edgewater, New Jersey 07020

(212) 302-8000

fhs@regency.net

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4)(A) because it contains 9,123 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using LibreOffice in 14-point Liberation Serif.

/s/ FELIX SATER

FELIX SATER

44

# 26-780-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

**CITY OF ALMATY, KAZAKHSTAN, BTA BANK JSC,**

*Plaintiffs-Appellees,*

- v. -

**FELIX SATER,**

*Defendant-Appellant,*

DANIEL RIDLOFF, BAYROCK GROUP INC., GLOBAL HABITAT
SOLUTIONS INC., RRMI-DR LLC, FERRARI HOLDINGS LLC,
MEM ENERGY PARTNERS LLC,

*Defendants,*

*(For Continuation of Caption See Inside Cover)*

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

---

# SPECIAL APPENDIX
# FOR DEFENDANT-APPELLANT

---

**FELIX SATER**

*Defendant-Appellant Pro Se*

725 River Road, Suite 32125

Edgewater, New Jersey 07020

(212) 302-8000 | fhs@regency.net

# CONTINUATION OF OFFICIAL CAPTION

**FREDERICK M. OBERLANDER,**

Intervenor,

**DIANE ARTAL-BURGER,**

Third-Party-Defendant.

# SPECIAL APPENDIX CONTENTS

Opinion and Order, filed November 30, 2020 (ECF 244)      SPA-1-SPA-25

Opinion and Order, filed January 15, 2025 (ECF 702)      SPA-26-SPA-52

Opinion and Order, filed August 6, 2025 (ECF 761)      SPA-53-SPA-81

Clarification Order, filed August 6, 2025 (ECF 762)      SPA-82-SPA-92

Order directing default judgment against Ferrari Holdings LLC,

filed February 27, 2026 (ECF 832)      SPA-93-SPA-102

Judgment, filed February 27, 2026 (ECF 833)      SPA-103-SPA-108

New York Civil Practice Law and Rules § 214      SPA-109

Federal Rule of Civil Procedure 51      SPA-110-SPA-111

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/30/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

City of Almaty, *et al.*,

          Plaintiffs,

    –v–

Felix Sater, *et al.*,

          Defendants.

19-cv-2645 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

In this case, Kazakhstan's largest city and a Kazakhstani bank seek to recover millions of dollars in stolen funds from those who allegedly helped the culprits launder them. Felix Sater—the alleged ringleader of the money-laundering operation—along with his associate Daniel Ridloff and several business entities they control, move to dismiss. For the reasons that follow, the Court grants the motion in part and denies it in part.

## I. Background

For purposes of this motion, the Court takes as true all factual allegations in the first amended complaint ("FAC"), Dkt. No. 120, and draws all reasonable inferences in the Plaintiffs' favor.

Between 1997 and 2009, Mukhtar Ablyazov and Viktor Khrapunov—sometimes working separately and sometimes in concert—used their prominent positions in Kazakhstani society and government to steal billions of dollars from the City of Almaty and BTA Bank JSC, a corporation headquartered there. Khrapunov served as Kazakhstan's Minister of Energy before taking office as the mayor of Almaty in 1997. FAC ¶ 53. As mayor, he wielded substantial

influence over the privatization of state-run assets in the formerly communist country. *Id.* ¶ 54. He used this influence to transfer public assets to shell companies controlled by his family members for a fraction of their value. *Id.* ¶¶ 56–62.

Ablyazov founded BTA and served as its chairman from 2005 to 2009. *Id.* ¶¶ 16–17. However, even before 2005 (including while serving a nine-month prison term for corruption), he exercised substantial informal influence over the bank's operations through a business partner. *Id.* ¶¶ 19–20. Ablyazov used his position to direct billions of dollars in sham loans from BTA to shell corporations that he secretly controlled. *Id.* ¶ 16. He also worked with Khrapunov, to whom he was related by marriage, using his network of shell companies to launder Khrapunov's ill-gotten gains and Khrapunov's properties as collateral for further fraudulent BTA loans. *Id.* ¶¶ 57–61.

Ablyazov's graft came to light after BTA defaulted on billions of dollars of debt in the wake of the 2008 financial crisis. *Id.* ¶ 30. In 2009, the New York Times reported that Ablyazov may have directed up to $12 billion in loans to companies he controlled, amounting to about half of the bank's loan book. *Id.* ¶ 31. Ablyazov fled to London. *Id.* ¶ 33. English courts entered a series of judgments against him for over $4 billion, imposing worldwide asset-freezing orders, requiring him to disclose details of his assets and surrender his passport, and ordering that his assets be placed into receivership. *Id.* ¶¶ 36–43, 47. Ablyazov largely defied these orders. *Id.* ¶ 44. An English court held him in criminal contempt and sentenced him to prison. *Id.* He then fled the United Kingdom and remained a fugitive until he was apprehended in France in mid-2013. *Id.* ¶ 46. A court in Kazakhstan sentenced him in absentia to 20 years' imprisonment for embezzlement, abuse of office, and organizing a criminal enterprise. *Id.* ¶ 49.

2

Khrapunov's career in Kazakhstani politics met a similar end. He and his wife fled to Switzerland in 2007. *Id.* ¶ 64. Kazakhstani authorities indicted Khrapunov and several members of his family in 2011 and 2012. *Id.* Switzerland opened an investigation against him for money laundering, which remains ongoing, and ordered his assets frozen. *Id.* ¶ 65.

Shortly after an English court ordered his assets frozen, but before he fled the United Kingdom, Ablyazov met with his son-in-law Ilyas Khrapunov in London and hatched a scheme to evade the English asset-freezing orders. *Id.* ¶ 66. The two of them routed about $440 million through a series of shell companies owned by members of the Khrapunov family into accounts at FBME bank. *Id.* ¶¶ 68–77. The next challenge was to get the funds out of FBME without arousing suspicion. That is where Felix Sater enters the picture.

Sater began working with Viktor Khrapunov and other members of the Khrapunov family with his company Bayrock Group LLC in the mid-2000s. *Id.* ¶¶ 89–91. While Khrapunov was the mayor of Almaty, Sater and the Khrapunov family pursued several coal and gas extraction ventures together in Kazakhstan. *Id.* ¶ 93. Sater met Ablyazov at the wedding of Ablyazov's daughter Madina Ablyazova and Ilyas Khrapunov in 2007. *Id.* ¶ 96. Around that time, he learned of Ablyazov's theft of BTA funds. *Id.*

Ilyas approached Sater near the end of 2011 and asked him to help launder money that Ablyazov and Khrapunov had stolen from BTA and Almaty. *Id.* ¶ 102. Throughout his involvement with the money-laundering scheme, Sater knew that the funds were the rightful property of BTA and Almaty and were subject to asset-freezing orders. *Id.* ¶ 103. The two negotiated the terms of Sater's involvement, and Sater executed a consulting agreement in early 2012 with Swiss Promotion Group ("SPG"), a company owned and controlled by Ilyas and used to launder the stolen funds. *Id.* ¶ 104. Working with Ilyas, Sater devised and executed a series

3

of schemes to launder the stolen funds, relying on his associate Daniel Ridloff and several business entities they owned and controlled. *Id.* ¶ 119–272. In the course of doing so, they pocketed tens of millions of dollars stolen from BTA and Almaty. *Id.* ¶ 272.

In the first of these schemes, Sater created a sham healthcare startup called World Health Networks ("WHN"). *Id.* ¶¶ 120, 124. Sater installed Ridloff as the company's chief operating officer, and Ridloff submitted fraudulent visa applications for individuals connected to the Khrapunov family, including Ilyas's sister Elvira Kudryashova, who they misrepresented as the owner of the business. *Id.* ¶¶ 128, 133–34. Sater and Ridloff used the company to launder about $7,000,000 into the United States between June 20, 2012, and March 1, 2013. *Id.* ¶ 140. Sater and Ridloff received millions of dollars in consulting fees related to their work for WHN and spent WHN funds on lavish personal expenses. *Id.* ¶ 143. Sater also received transfers of about $1,300,000 to a company he wholly owned and controlled between March 2012 and July 2013, and he paid several of his personal credit card bills from WHN accounts. *Id.* ¶¶ 145, 150. In April 2013, Sater oversaw about $5,000,000 in fraudulent personal loans to Kudryashova, which were funneled into New York City residential units in which Sater had a financial interest through Bayrock. *Id.* ¶¶ 155–57, 165–68.

In another scheme, Sater and Ridloff used a straw purchaser to buy the French payment card processing corporation Creacard S.A. with funds from SPG subject to asset-freezing orders. *Id.* ¶¶ 169–81. In another, they purchased a disused mental health facility in Syracuse, New York, for a shell company called Syracuse Center LLC, which was a subsidiary of Triadou SPV S.A., which was itself a subsidiary of Swiss Development Group S.A. ("SDG"), a Swiss entity owned by Ilyas and funded by Ablyazov and the Khrapunov family. *Id.* ¶¶ 99, 182–90. The

4

Creacard transaction took place between November 2012 and April 2013, and the Syracuse transaction took place between April and July 2013.

The largest money-laundering scheme undertaken by Sater and Ridloff centered on the Tri-County Mall in Cincinnati, Ohio. *Id.* ¶¶ 191–93. The pair learned that the holder of some of the mall's debt was having financial difficulties. *Id.* ¶ 194. Sater and Ridloff sought to launder about $30,000,000 by quickly purchasing and then reselling the mall's debt with tainted funds held in an FBME account for Telford International Ltd., another of the shell companies controlled by Ilyas. *Id.* ¶ 158–60, 195.

Sater and Ridloff created a shell company headquartered in New York called Tri-County Mall Investors LLC ("TCMI") to conduct the transaction in April 2013. *Id.* ¶ 196. TCMI was a subsidiary of Triadou. *Id.* At Sater's direction, Ridloff submitted a bid for the note on behalf of TCMI brimming with fraudulent misrepresentations. *Id.* ¶¶ 202–03. The bid identified a fictitious Luxembourg specialized investment fund as TCMI's funding source, claimed that CEO Nicolas Bourg would control the investment, and failed to disclose Sater's involvement with the transaction. *Id.* In fact, Sater and Ridloff held power of attorney over TCMI and planned to personally control the investment. *Id.* ¶¶ 200–01. These misrepresentations were designed to conceal the involvement of Sater, Ablyazov, and Khrapunov both from the seller (who they feared might balk if they knew who was behind it) and entities like Almaty and BTA who were investigating Ablyazov's and the Khrapunovs' investment activities. *Id.* ¶¶ 198–99, 204–06.

The bid was successful. *Id.* ¶ 207. Sater and Ridloff attempted to obtain financing for the deal through a mortgage broker, but the broker backed out once its background investigation revealed the relationship between TCMI and the Khrapunov family. *Id.* ¶¶ 211–214. They ultimately funded the transaction entirely with funds from Telford's FBME account. *Id.* ¶ 216.

5

Ilyas arranged for transfer of a $2,800,000 deposit and then a second payment of $28,000,000 in stolen funds to complete the transaction, routed through a real estate law firm from which Sater and Ridloff also concealed the origin of the funds. *Id.* ¶¶ 225–28.

Sater and Ridloff pocketed about a half-million dollars of the money transferred for the Tri-County Mall purchase. Shortly after the firm handling the transaction received the transfer from Telford's FBME account in May 2013, it redirected $1,080,000 on Ridloff's instructions to an account for Ferrari Holdings LLC as a purported finder's fee. *Id.* ¶ 230. The next day, Ferrari transferred exactly half that amount to an account for RRMI-DR LLC, a company wholly owned and controlled by Ridloff. *Id.* ¶¶ 231–32. RRMI in turn cut a check for $345,000 to Bayrock Inc. (no formal relationship to Bayrock LLC), another company wholly owned and controlled by Sater. *Id.* ¶¶ 233–34.

TCMI resold the Tri-County Mall note to a third party in July 2013 for $45,000,000. *Id.* ¶ 245. The funds were paid into an account held by TCMI that Sater and Ridloff controlled. *Id.* ¶¶ 247–49. They immediately disbursed more than $5,000,000 to entities controlled by Sater and other participants in the scheme. *Id.* ¶ 250. They also transferred $2,250,000 from the proceeds of the sale to MeM Energy Partners LLC, a company with no role in the Tri-County Mall transaction but whose owner, Mendel Mochkin, had done public relations work for Ablyazov following his flight from the United Kingdom and sentence for criminal contempt. *Id.* ¶¶ 251–56. Later that year, Sater and Ridloff transferred another $3,500,000 or so to accounts held by Bayrock Inc. *Id.* ¶¶ 258–60.

Conflict arose between Sater and Ilyas in late 2013. In December 2013, TCMI sued Sater and Ridloff, alleging they had transferred the proceeds of the Tri-County Mall sale to an account they controlled without TCMI's authorization. *Id.* ¶¶ 262–264. The parties reached a

6

confidential settlement. *Id.* ¶ 267. Several news organizations reported, and Sater later admitted in sworn testimony, that he retained approximately $20,000,000 in proceeds from the Tri-County Mall sale under the terms of the settlement. *Id.* ¶¶ 267–72.

Almaty and BTA have been involved in litigation with Ablyazov and Khrapunov since an interpleader action filed in 2015. Since early 2015, Sater has been in communication with the investigatory firm working on behalf of Almaty and BTA, and later with their counsel at Boies Schiller Flexner LLP. *Id.* ¶ 271. However, he omitted from his communications with them any mention of the settlement with TCMI and concealed that he had received stolen funds. *Id.* ¶¶ 269, 271. Almaty and BTA did not learn that Sater and Ridloff had received stolen funds until the March 2017 deposition of Cesare Cerrito, one of Ilyas's co-conspirators. *Id.* ¶ 269.

Almaty and BTA (which the parties in this litigation refer to collectively as "the Kazakh Entities") filed this suit against Sater, Ridloff, and several companies they allegedly control (collectively, "the Sater Defendants"), Ferrari, and MeM on March 25, 2019. *See* Dkt. No. 1. They assert claims of unjust enrichment, money had and received, fraud, and conversion under New York law and unlawful means conspiracy under English law. Ferrari and MeM are currently in default. The Sater Defendants have moved to dismiss. *See* Dkt. No. 105. They contend that the relationship between the Sater Defendants and the Kazakh Entities is too attenuated to support claims for unjust enrichment and money had and received; that they directed no fraudulent conduct toward the Kazakh Entities; and that the claim for unlawful means conspiracy fails because New York law governs this dispute. They further contend that the Kazakh Entities' claims are largely time-barred.

7

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When determining whether a complaint states a claim, a court accepts as true all allegations in the complaint and draws all reasonable inferences in favor of the non-moving party. *Id.* A defendant may raise the affirmative defense that a claim is time-barred in a motion to dismiss only if that defense appears on the face of the complaint. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989). A plaintiff must plead fraud with particularity. Fed. R. Civ. P. 9(b).

## III.    Discussion

### A.    The Kazakh Entities State Claims for Unjust Enrichment and Money Had and Received

A claim for unjust enrichment rests on a restitutionary obligation imposed by law. *State v. Barclays Bank of New York, N.A.*, 563 N.E.2d 11, 15 (N.Y. 1990) (citing Restatement of Restitution § 1). "The essential inquiry in any action for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (alteration omitted) (quoting *Paramount Film Distrib. Corp. v. State*, 285 N.E.2d 695, 698 (N.Y. 1972)). "A plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is

8

sought to be recovered." *Id.* (cleaned up). The Sater Defendants do not contest these elements, but instead contend that their connection to the Kazakh Entities is too attenuated to support a claim for unjust enrichment.

"[A] plaintiff need not be in privity with the defendant to state a claim for unjust enrichment . . . ." *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007). To the contrary, courts in New York and throughout the American legal system have long recognized claims for unjust enrichment against third-party recipients of wrongfully obtained property, and have developed elaborate doctrines governing the circumstances in which third party recipients may be required to make restitution. *See* Restatement (Third) of Restitution and Unjust Enrichment § 66 & cmt. b (noting that a bona fide purchaser for value takes an asset free of any equitable interests, but a donee does not); *Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978) (holding the same); *see, e.g., Hazlett v. Fusco*, 576 N.Y.S.2d 427, 429 (App. Div. 1991); *Bronowski v. Magnus Enterprises, Inc.*, 402 N.Y.S.2d 868, 869 (App. Div. 1978).

In more recent cases, the New York Court of Appeals has disallowed some claims for unjust enrichment when the relationship between the plaintiff and the defendant was "too attenuated." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 747 (N.Y. 2012); *Mandarin*, 944 N.E.2d at 1111. In *Mandarin*, an agent working for an art investor obtained an appraisal letter for a painting and presented it to the investor. *Mandarin*, 944 N.E.2d at 1106. Unbeknownst the investor, the author of the letter was the painting's owner, and it overstated the painting's value. *Id.* at 1107. The investor, having overpaid for the painting, sued the prior owner for unjust enrichment. *Id.* The court held that the relationship between the parties was too attenuated to render the circumstances of the transaction unjust—the prior owner "[n]ever met with [the

9

investor], was retained by [the investor] for an appraisal, or knew that the appraisal would be used by [the investor] for the purpose of purchasing the painting." *Id.* at 1109–10.

In *Georgia Malone*, the court held that the relationship between two rival brokerage firms was too remote when one received a commission on a sale using due diligence materials prepared for the developer by the other. *Georgia Malone*, 973 N.E.2d at 747. The defendant brokerage firm knew that the plaintiff brokerage firm had prepared the materials, but it was unaware that the developer had agreed to keep them confidential or had failed to pay for them. *Id.* The defendant even offered to reimburse the developer for the amount it assumed the developer had paid the plaintiff for the materials. *Id.*

The Court does not read these cases to abrogate the well-settled rule that a claim for unjust enrichment lies against the knowing recipient of wrongfully obtained property, or the myriad cases in which New York courts have imposed constructive trusts against defendants who had no direct business dealings with the plaintiff. The claims in *Georgia Malone* and *Mandarin* rested on the alleged unfairness of particular transactions. Due to the lack of connection between the parties, it was not unjust to allow the defendants to retain what they had received in those transactions. *See Mandarin*, 944 N.E.2d at 1111 ("Without further allegations, the mere existence of a letter that happens to find a path to a prospective purchaser does not render this transaction one of equitable injustice requiring a remedy to balance a wrong."); *Georgia Malone*, 973 N.E.2d at 747("The pleadings do not implicate [the defendant brokerage firm] in the [developer's] alleged wrongdoing.").

Unlike in *Georgia Malone* and *Mandarin*, the lack of direct business dealings between the Sater Defendants and the Kazakh Entities does not suggests that it would be just for the Sater Defendants to retain the stolen funds. Nor does the imposition of liability on a knowing recipient

10

of stolen funds risk imposing an unfair inquiry burden on contracting parties. *See Georgia Malone*, 973 N.E.2d at 748.

At least one court in this district has allowed a claim for unjust enrichment to proceed on very similar facts. *See Amusement Indus., Inc. v. Midland Ave. Assocs.*, LLC, 820 F. Supp. 2d 510, 537 (S.D.N.Y. 2011). In *Amusement*, fraudster Mark Stem convinced Amusement Industries to deposit about $13,000,000 into an escrow account to purchase properties in which Amusement was to receive an ownership interest. *Id.* at 519. Instead of using the funds to purchase the properties, Stern transferred the funds to an account held by his company. *Id.* He then disbursed funds to a number of his family members and friends in order to frustrate Amusement's attempts to recover it. *Id.* at 520.

The third-party recipients of the stolen funds in *Amusement* made exactly the argument the Sater Defendants make here: that because they did not receive the money directly from Amusement, their relationship was too attenuated to support a claim for unjust enrichment. *Id.* at 537. Like the Sater Defendants, they did not have any direct business dealings with the plaintiff. Also like the Sater Defendants, accepting the Kazakh Entities' allegations as true, they knew that the funds rightfully belonged to the plaintiff and that by accepting the funds they were "furthering a money-laundering scheme." *Id.*; *see* FAC ¶¶ 289–90. The Court rejected these arguments. It held that "[b]ecause Amusement alleges that the defendants knew that they were receiving Amusement's escrow funds illegitimately," the defendants had a sufficiently close relationship to support a claim for unjust enrichment. *Amusement*, 820 F. Supp. 2d at 537. The Sater Defendants cite no case in which a court has disallowed a claim for unjust enrichment in similar circumstances.

11

The Court is persuaded by the decision in *Amusement*. The lack of any direct business dealings between a plaintiff and defendant may undermine the claim that the defendant was unjustly enriched in many circumstances. However, it remains black letter law that "a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment." *Sperry*, 863 N.E.2d at 1018. The knowing receipt of stolen funds in furtherance of a money-laundering scheme, in the circumstances of this case, amounts to a sufficiently close connection to support a claim for unjust enrichment. The Court therefore concludes that the Kazakh Entities have stated such a claim.

To maintain an action for money had and received, "New York law requires the following elements: (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir. 1987) (internal quotation marks and citation omitted). The Sater Defendants contend that because a claim for money had and received closely resembles a claim for unjust enrichment, it too requires that a plaintiff plead a sufficiently close relationship to the defendant. For the same reasons as with respect to the Kazakh Entities' claim for unjust enrichment, the knowing receipt of stolen funds amounts to a sufficiently close relationship. The Court concludes that the Kazakh Entities have stated a claim for money had and received.

### B. The Kazakh Entities Fail to State a Claim for Fraud

"The elements of a fraud cause of action consist of a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Pasternack v. Lab. Corp. of Am. Holdings,*

12

59 N.E.3d 485, 491 (N.Y. 2016) (cleaned up). A fraud claim under New York law requires that the misrepresentation or omission be made to the plaintiff—whether directly or indirectly—and that the plaintiff, rather than a third party, rely on it. *Id.* at 492–93.

The Kazakh Entities' claim for fraud centers on the bid package Sater and Ridloff submitted for the Tri-County Mail deal. *See* FAC ¶¶ 309–16. They allege that "[t]he Real Estate Advisor [for the seller of the note] relied on the fraudulent Bid Package" and that "Plaintiffs were damaged as a result of this fraudulent Bid Package, as the Real Estate Advisor would not have selected TCMI's bid had the Bid Package truthfully disclosed involvement of the Stolen Funds." *Id.* ¶¶ 314, 316. The Kazakh Entities fail to state a claim for fraud, because they allege injury based only on the real estate advisor's reliance, not their own.

To escape this result, the Kazakh Entities contend in their briefing that the misrepresentations in the bid package were "specifically designed for the consumption of the Kazakh Entities." Plf. Br., Dkt. No. 124, at 26. They further contend that the Sater Defendant's partial disclosures in the bid package gave rise to a duty to truthfully disclose the source of the funds. The Court, however, need not decide whether the misrepresentations and omissions in the bid package would be actionable by the Kazakh Entities were the other elements of fraud satisfied. The reliance element is not satisfied. *Pasternack* is crystal clear that a claim for fraud under New York law does not "include a claim based on the reliance of a third party, rather than the plaintiff." *Pasternack*, 59 N.E.3d at 493. While the Sater Defendant's misrepresentations may have frustrated the Kazakh Entities' investigation and hindered them in bringing suit, it was the real estate advisor's reliance—and their reliance alone—that allowed the Sater Defendants to convert the stolen funds. This third-party reliance falls short of what New York law requires to state a claim for fraud.

13

## C.    The Kazakh Entities State a Claim for Conversion

The Sater Defendants do not dispute that the Kazakh Entities state a claim for conversion, only that such claim is timely. The Kazakh Entities allege that the Sater Defendants intentionally exercised control over specific funds that belonged to them to deprive them of use of those funds altogether, and so state a claim for conversion. *See Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1275 (N.Y. 2007) (citing Restatement (Second) of Torts § 222A(1)).

## D.    The Kazakh Entities Fail to State a Claim for Unlawful Means Conspiracy Under English Law

The Kazakh Entities assert a claim for unlawful means conspiracy under English law; that is, they contend that that the Sater Defendants are liable for forming an agreement to act unlawfully and taking overt acts in furtherance of that agreement that caused them harm. *See* Plf. Br. at 35 (citing *Revenue and Customs Commissioners v Sunico A/S*, [2013] EWHC 941 (Ch), 2013 WL 1563186). The Kazakh Entities do not identify any parallel cause of action available under New York law. Thus, their claim can succeed only if English law governs the claim. The Court concludes that it does not.

A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626–27 (2d Cir. 1998) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under New York law, a court first must first "determine whether there is an actual conflict between the laws of the jurisdictions involved." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (quoting *In re Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993)). If so, "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997) (citing *Babcock v. Jackson*, 191 N.E.2d 279, 283–84 (N.Y. 1963)). The

14

parties do not dispute that a true conflict exists, because English law allows a freestanding claim for conspiracy and New York law does not. But they differ on whether the governmental interest analysis favors the application of English law or New York law on these facts.

In evaluating the governmental interests involved in a dispute, New York courts distinguish between rules that regulate primary conduct and those that regulate the allocation of loss. *See Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.* The fraudulent schemes the Kazakh Entities identify in their complaint occurred in New York, and that is where the Sater Defendants allegedly converted the Kazakh Entities' money to their own purposes. *See* FAC ¶¶ 123, 140 (money wired to New York shell companies for purported investments in WHN); ¶¶ 163–68 (money laundered by purchasing residential units in New York City); ¶¶ 169–77 (New York-based entity used to purchase Creacard); ¶¶ 182–85 (New York entity used to purchase disused mental health facility in New York); ¶ 197 (New York entity created to purchase and re-sell the Tri-County Mall note). Each of the Sater Defendants "is domiciled in the State of New York, and . . . knowingly committed acts in New York that form the basis of this action." FAC ¶ 15. None of the alleged conduct by the Sater Defendants occurred in the United Kingdom.

The United Kingdom's interest in enforcing its asset-freezing order is not squarely implicated by the Kazakh Entities' claim for unlawful means conspiracy; nor is it enough to surmount New York's interest in regulating conduct within its borders. The gravamen of that claim is not circumvention of an English court order. It is a conspiracy to use unlawful means (including violations of both English and American law) and overt acts in furtherance of that

15

conspiracy. *See* FAC ¶¶ 335–41. All of the conduct contemplated by the conspiracy and the overt acts in furtherance of it occurred in New York. The Court rejects the Kazakh Entities' rather metaphysical argument that the tort "was not complete until the conspiracy achieved its intended goal of successfully helping to evade the Worldwide Freezing Orders." Plf. Br. at 37. Under New York's choice-of-law rules, the jurisdiction with the greatest interest in regulating conduct is nearly always the jurisdiction where that conduct occurs.

The Kazakh Entities note that New York law allows dépeçage—that is, where the law of one jurisdiction governs some issues in a case and the law of another jurisdiction others. *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 n.4 (2d Cir. 2008) (citing *Babcock*, 191 N.E.2d at 285). However, dépeçage applies only where the governmental interest analysis shakes out differently for different legal rules. It does not simply allow a plaintiff to pick and choose their favorite causes of action from different legal systems. In a typical case, a court may interpret a contract under the law of the place it was executed, while looking to the law of the place of performance to determine whether its object was lawful. *See, e.g., Hutner v. Greene*, 734 F.2d 896, 900–01 (2d Cir. 1984). Or it may apply the law of the place of the tort to the standard of care, but the law of the domicile of the parties to whether a particular class of plaintiffs may recover. *See, e.g., Babcock*, 191 N.E.2d at 285. The liability rules for the Kazakh Entities' various causes of action are all rules that regulate conduct. The considerations underlying the governmental interest analysis for each are largely the same. The Kazakh Entities do not articulate any reason why New York law should govern the conduct-regulating rules in their claims for fraud and conversion, but not those for unlawful means conspiracy arising out of the same conduct.

16

English law does not govern any issue in this case thus far raised by the parties. The Court therefore dismisses the Kazakh Entities' claim for unlawful means conspiracy arising under English law.

### E.  The Kazakh Entities' Claims are Not Untimely

The Sater Defendants allegedly received stolen funds during 2012 and 2013. The Kazakh Entities filed suit on March 25, 2019. The Sater Defendants contend that the Kazakh Entities' claims for unjust enrichment and conversion are subject to a three-year statute of limitations and are therefore time-barred. The claim for money had and received is subject to a six-year statute of limitations, and so the Sater Defendants contend that they may be held liable only for any stolen funds they received prior to March 25, 2013. The Court agrees with the Sater Defendants as to the applicable limitations periods. However, because it is not clear on the face of the complaint that equitable estoppel does not toll the statute of limitations, the Court declines to hold, in this posture, that any of the claims are untimely. *See Pani*, 152 F.3d at 74; *cf. Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 712 (2d Cir. 2002) (holding that a court may reject equitable tolling as a matter of law only where it is "evident from the face of the complaint" that the plaintiff will be unable to make the required factual showing).

#### 1.  Statute of Limitations

Only the limitations period for unjust enrichment is disputed. The parties agree that a claim for money had and received under New York law must be brought within six years. *See* Plf. Br. at 31; Def. Br., Dkt. No. 134, at 12; *see also Reg'l Econ. Cmty. Action Program, Inc. v. Enlarged City Sch. Dist. of Middletown*, 964 N.E.2d 396, 398 (N.Y. 2012). They agree that a claim for conversion must be brought within three. *See* Plf. Br. at 33; Def. Br. at 18; *see also Obstfeld v. Thermo Niton Analyzers, LLC*, 93 N.Y.S.3d 338, 341 (App. Div. 2019). They

17

disagree, however, as to whether a three- or six-year limitations period applies to the Kazakh Entities' claims for unjust enrichment.

The New York Civil Practice Law and Rules do not define a limitations period for unjust enrichment. Section 214 sets a limitations period of three years for suits including "an action to recover a chattel or damages for the taking or detaining of a chattel" and "an action to recover damages for an injury to property." N.Y. C.P.L.R. § 214(3)–(4). Section 213 sets a limitations period of six years for suits including "an action for which no limitation is specifically prescribed by law" and "an action upon a contractual obligation or liability, express or implied." N.Y. C.P.L.R. § 213(1)–(2).

Sources of binding authority shed little light on this question. Answering a certified question from the Second Circuit, the New York Court of Appeals has held that a "six-year statute of limitations . . . governs a claim for unjust enrichment from a breach of fiduciary obligation" when the plaintiffs seek equitable relief, at least for certain shareholder disputes. *Loengard v. Santa Fe Indus., Inc.*, 514 N.E.2d 113, 114–15 (N.Y. 1987) (internal citation omitted). The Second Circuit has held that "[t]he statute of limitations in New York for claims of unjust enrichment, breach of fiduciary duty, corporate waste, and for an accounting is generally six years." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001). The word "generally" in *Golden Pacific*, however, carries a heavy load: the Second Circuit has also recognized that the claims in *Loengard* "would be governed by a three-year limitations period if the action sought monetary relief but by a six-year period if the action sought equitable relief." *Cooper v. Parsky*, 140 F.3d 433, 441 (2d Cir. 1998) (citing *Loengard*, 514 N.E.2d at115).

Further complicating matters, *Loengard* did involve the possibility of monetary relief, albeit in the form of an equitable decree, and the court there said six years, not three. *Loengard*,

18

514 N.E.2d at 115 ("[T]he relief demanded in the complaint here—the restoration of the minority to their status as full stockholders, or, alternatively, a determination of the fair value of their shares and an order directing defendants to pay that value for them—is equitable in nature . . . ."). These cases stand for the proposition that the limitations period for a claim of unjust enrichment predicated on a breach of fiduciary duty depends on whether the action more closely resembles one "to recover damages for an injury to property" or one "for which no limitation is specifically prescribed by law" (including suits in equity). N.Y. C.P.L.R. §§ 213–14. They do not rule out that other provisions of §§ 213–214 might govern claims for unjust enrichment in other contexts.

New York's intermediate appellate courts have split in their treatment of the statute of limitations for unjust enrichment. The Second Department has held that the three-year limitations period under C.P.L.R. § 214(3) applies to a claim for unjust enrichment whenever a plaintiff seeks monetary relief. *See Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134 (App. Div. 2007); *see, e.g., Lambert v. Sklar*, 817 N.Y.S.2d 378, 380 (App. Div. 2006) (applying three-year limitations period where plaintiff sought damages); *Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 596 N.Y.S.2d 435, 437 (App. Div. 1993) (applying six-year limitations period where plaintiff sought a constructive trust). The First Department, recognizing the split, has applied the six-year limitations period when a claim for unjust enrichment rests on facts that also support another claim governed by a six-year statute of limitations, even when the plaintiff seeks damages. *See Deutsche Bank, AG v. Vik*, 40 N.Y.S.3d 23, 24–25 (App. Div. 2016); *see, e.g., Maya NY, LLC v. Hagler*, 965 N.Y.S.2d 475, 477 (App. Div. 2013); *Knobel v. Shaw*, 936 N.Y.S.2d 2, 6 (App. Div. 2011). For example, when addressing a claim for unjust enrichment coupled with a claim for breach of contract, it reasoned that in these circumstances liability for

19

restitution arises from a quasi-contractual obligation imposed by law. *See Maya*, 965 N.Y.S.2d at 477; *see also Georgia Malone*, 973 N.E.2d at 746 ("The theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice." (cleaned up)). Such a claim thus more closely resembles "an action upon a contractual obligation or liability, express or implied" or a suit in equity, C.P.L.R. § 213(1)–(2), than a tort claim for conversion or trespass to chattels, *see* C.P.L.R. § 214(3)–(4). In essence, the First Department emphasizes the nature of the claim, where the Second Department emphasizes the nature of the remedy. *Cf. Paver & Wildfoerster v. Catholic High Sch. Ass'n*, 38 N.Y.2d 669, 675, 345 N.E.2d 565, 568–59 (N.Y. 1976) (describing how New York courts have historically considered both the claim and remedy in determining the applicable statute of limitations). To the extent that the Kazakh Entities contend that unjust enrichment is *always* subject to a six-year limitations period in the First Department, the Court rejects that reading of the cases as plainly irreconcilable with *Loengard*.

Federal courts in this district have largely followed the Second Department without comment and have applied a three-year limitations period whenever a claim for unjust enrichment seeks monetary relief. *See, e.g., Cohen v. Dunne*, No. 15-cv-3155 (DAB), 2017 WL 4516820, at *3 (S.D.N.Y. Sept. 27, 2017); *Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013); *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 263 (S.D.N.Y. 2008); *Grynberg v. Eni S.p.A.*, No. 06-cv-6495 (RLC), 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007); *Hughes v. LaSalle Bank, N.A.*, 419 F. Supp. 2d 605, 612 (S.D.N.Y. 2006), *vacated on other grounds*, No. 06-3778-CV, 2007 WL 4103680 (2d Cir. Nov. 19, 2007).

The Court is skeptical of the line of cases in this district that simply recite the Second Department's rule without considering the split of authority or the specific provisions of the New

20

York Civil Practice Law and Rules. However, on these facts, a three-year limitations period

applies under either the First or Second Department's standard. The Kazakh Entities do not

allege elements of a contract claim. The gravamen of their claims is not that of an implied-in-

law contract but of a restitutionary obligation arising from an alleged conversion of their

property. Because their claim for unjust enrichment rests on "the taking or detaining" of their

property, it most closely resembles the types of actions defined in C.P.L.R. § 214. *See Bd. of

Managers of Chelsea 19 Condo. v. Chelsea 19 Assocs.*, 905 N.Y.S.2d 8, 10 (App. Div. 2010).

And the relief they seek—compensatory and punitive damages—is unquestionably legal, not

equitable, in nature. *See* FAC at 70. Both the "'essence' of . . . the wrong complained of" and

the "form of the remedy" suggest a three-year limitations period. *Paver*, 345 N.E.2d at 568–59

(citations omitted). The Court therefore concludes that a three-year limitations period applies to

their claim for unjust enrichment.

### 2. Equitable Estoppel

New York "courts have long had the power, both at law and equity, to bar the assertion of

the affirmative defense of the Statute of Limitations where it is the defendant's affirmative

wrongdoing . . . which produced the long delay between the accrual of the cause of action and

the institution of the legal proceeding." *Gen. Stencils, Inc. v. Chiappa*, 219 N.E.2d 169, 171

(N.Y. 1966). Under the doctrine of equitable estoppel, "a defendant is estopped from pleading a

statute of limitations defense if the 'plaintiff was induced by fraud, misrepresentations or

deception to refrain from filing a timely action.'" *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d

189, 198 (N.Y. 2007) (quoting *Simcuski v. Saeli*, 377 N.E.2d 713, 716 (N.Y. 1978)). "New York

appears to use the label 'equitable estoppel' to cover both the circumstances where the defendant

conceals from the plaintiff the fact that he has a cause of action and where the plaintiff is aware

21

of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired." *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002) (cleaned up).

For equitable estoppel to apply, "a plaintiff may not rely on the same act that forms the basis for the claim." *Ross*, 868 N.E.2d at 198. The plaintiff must point to distinct acts designed to conceal the prior wrongdoing. *Id.* "A wrongdoer is not legally obliged to make a public confession, or to alert people who may have claims against it, to get the benefit of a statute of limitations." *Zumpano v. Quinn*, 849 N.E.2d 926, 930 (N.Y. 2006). A plaintiff must either allege either specific acts of "deceptive conduct" or "a fiduciary relationship which gave the defendant an obligation to inform him or her of facts underlying the claim." *Id.* (citations and alterations omitted).

Equitable estoppel cases in the New York Court of Appeals have most often turned on whether a defendant's subsequent acts of concealment were responsible for a plaintiff's delay in bringing suit. For example, the court has held that equitable estoppel did not apply in a suit brought by victims of child abuse by priests. The victims did not allege any "separate and subsequent acts of wrongdoing" that would have prevented them from suing within the limitations period. *Id.* The Diocese had reassigned priests without disclosing their offenses and taken steps to avoid claims of sexual misconduct being publicized. *Id.* However, the court noted that these actions, while "morally questionable," did not affect the ability of the victims to bring their claims in a timely fashion: the "concealment . . . of the priests' conduct, postwrongdoing, does not alter the fact that plaintiffs were fully aware that they had been abused. Plaintiffs also knew the identity of their abusers and that the abusers were employed by the Diocese." *Id.* Thus, the court held that the Diocese's conduct was not responsible for the victims' delay in

22

bringing suit. Similarly, the court has held that equitable estoppel did not apply where an adoption agent misrepresented the mental health of a child, because the adoptive parents did not contact the agency again, and thus no further deceptive conduct occurred, until long after the statute of limitations had lapsed. *See Ross*, 868 N.E.2d at 198.

The New York Court of Appeals has allowed the application of equitable estoppel where a bookkeeper pilfered petty cash and concealed the losses by making forged entries in the books. *General Stencils*, 219 N.E. at 125, 128–29. The court held that it was a factual question suitable for disposition on a new trial whether the plaintiff's failure to discover the theft within the limitations period was the result of the bookkeeper's artifice or its own negligence. *Id.* at 128–29. So too when a physician told a patient that the injuries she suffered as a result of his malpractice were transient and the statute of limitations lapsed while she waited in vain for recovery. *Simcuski*, 377 N.E.2d at 715. The dividing line between *Zumpano* and *Ross* on the one hand and *General Stencils* and *Simcuski* on the other is whether deceptive conduct apart from the underlying wrongdoing could fairly be said to have caused the plaintiff's failure to timely file.

Although the Kazakh Entities' allegations of deceptive conduct are thin, they are enough at the pleading stage to plausibly support the application of equitable estoppel. The Kazakh Entities identify three broad categories of deceptive conduct. First, they point to the manner in which the Sater Defendants conducted the transactions by which they laundered the stolen funds. This includes both an overarching strategy to obscure the source of the funds and specific fraudulent misrepresentations designed to evade detection by the Kazakh Entities' investigators. *See, e.g.*, FAC ¶ 158 (describing the Sater Defendants' general strategy to avoid having transactions flagged as suspicious); ¶¶ 202–06 (describing specific misrepresentations in the bid

23

for the Tri-County Mall deal "designed not to arouse the suspicions of the Kazakh Entities . . . [who] were actively investigating the Khrapunovs' and Ablyazov's investment activities"). Second, they note the settlement agreement Sater entered into with TCMI, which kept from public view his role in the transaction and receipt of stolen funds. *Id.* ¶¶ 267–69. Third, they allege that Sater was in communication with the Kazakh Entities' investigatory firm since early 2015, but actively concealed his role in the money-laundering activities and that he had received stolen funds. *Id.* ¶¶ 269–71. They allege that despite diligent investigation, as a result of this concealment, they did not learn that the Sater Defendants had received stolen funds until March 2017, after many of their claims would have been time-barred. *Id.* ¶ 269.

These factual allegations suffice to plausibly allege that the Sater Defendants' deceptive conduct, distinct from the actions forming the basis for the Kazakh Entities' claims, prevented them from timely bringing suit. The Kazakh Entities' surviving claims essentially sound in conversion. To prevail on those claims, they must prove only that the Sater Defendants took money that rightfully belonged to them. They need not prove that the Sater Defendants accomplished that task with subterfuge or successfully covered their tracks afterwards. That is, the Kazakh Entities do not allege merely a "self-concealing wrong." *Sejin Precision Indus. Co. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 552 (S.D.N.Y. 2016). The Sater Defendants' corporate shell game and fraudulent bid on the Tri-County Mall deal are distinct acts from those that give rise to liability. Like with the bookkeeper in *Simcuski*, the claim rests on taking the money, not hiding it. The hiding, if proved as alleged, supports the application of equitable estoppel.

While insufficient to justify equitable estoppel on their own, the Tri-County Mall settlement agreement and Sater's selective disclosures to the Kazakh Entities' investigators bolster the Court's conclusion. To be sure, a confidential settlement that prevents one's

24

wrongdoing from coming to light does not, by itself, amount to the sort of active concealment necessary for equitable estoppel. *See Zumpano*, 849 N.E.2d at 930. The Court also doubts that the relationship between a private investigator and an apparent cooperating source amounts to the sort of fiduciary relationship contemplated by the equitable estoppel cases. *See id.* Still, these allegations further suggest a broad pattern of deceptive conduct designed to frustrate the Kazakh Entities' ability to use civil process to recover their stolen funds. They further suggest that the Sater Defendants intended to prevent the Kazakh Entities from timely bringing suit and that their failure to do so was the reasonable result of this pattern of deception, not their own lack of diligence. *See Ross*, 868 N.E.2d at 198.

The Court emphasizes that the Kazakh Entities will need to adduce evidence showing the Sater Defendants' deceptive conduct and their justifiable reliance on that conduct in significantly greater detail to meet their burdens of production and of proof as the case progresses. However, at this stage, the Court concludes that it is not clear on the face of the complaint that their claims are untimely, and so declines to dismiss any claims on that basis.

### Conclusion

The Court GRANTS the Sater Defendants' motion to dismiss as to the Kazakh Entities' claims for fraud and unlawful means conspiracy, and it dismisses those claims with prejudice. The Court otherwise DENIES the motion. This resolves Docket Number 105.

SO ORDERED.

Dated: November 30, 2020
      New York, New York

                                             ALISON J. NATHAN
                                    United States District Judge

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**CITY OF ALMATY, KAZAKHSTAN, ET AL.,**

　　　　　　　　　**Plaintiffs,**　　　　　**19-cv-2645 (JGK)**

　　　　**- against -**　　　　　　　　　**MEMORANDUM OPINION AND**
　　　　　　　　　　　　　　　　　　　　**ORDER**

**FELIX SATER, ET AL.,**

　　　　　　　　　**Defendants.**

---

**JOHN G. KOELTL, District Judge:**

The plaintiffs, the City of Almaty, Kazakhstan ("Almaty"), and BTA Bank JSC ("BTA"), brought this action against various defendants, including Felix Sater, Bayrock Group Inc. ("Bayrock"), Global Habitat Solutions Inc. ("GHS") (together with Sater and Bayrock, the "Sater Defendants"), and MeM Energy Partners LLC ("MeM") (collectively, the "defendants"). After extensive pre-trial proceedings and a nearly three-week trial, the jury returned a verdict in favor of the plaintiffs and against each of the defendants.

The defendants now move for judgment as a matter of law dismissing the claims against them pursuant to Federal Rule of Civil Procedure 50(b) or for a new trial pursuant to Federal Rule of Civil Procedure 59. In turn, the plaintiffs now move to enter judgment in accordance with the jury's verdict.

1

SPA-26

**I.**

The Court assumes familiarity with the history of this case, which has been described in previous opinions. <u>See, e.g.</u>, ECF Nos. 244, 323, 392, 396, 625, 673. The following summary sets forth only those facts necessary to contextualize the rulings on the parties' post-verdict motions.[1]

**A.**

The plaintiffs brought this case on March 25, 2019. ECF No. 1. On May 21, 2022, the plaintiffs filed the presently operative Second Amended Complaint ("SAC"), ECF No. 399.

The plaintiffs allege that Victor Khrapunov, the former mayor of Almaty, misappropriated funds from Almaty through fraudulent means. SAC ¶¶ 53-62. The plaintiffs also contend that Mukhtar Ablyazov, the former chairman and controlling shareholder of BTA, misappropriated funds from BTA by causing BTA to make fraudulent loans to companies controlled by Ablyazov. <u>Id.</u> ¶¶ 16-49. According to the plaintiffs, the funds stolen from BTA were then mixed and laundered through the world by Ablyazov and Ilyas Khrapunov ("Ilyas"), Victor Khrapunov's son and Ablyazov's son-in-law. <u>Id.</u> ¶¶ 50-52. Similarly, the funds stolen from Almaty were laundered with the aid of Ablyazov through his control of BTA. <u>Id.</u> ¶ 57.

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

Against this backdrop, in this case, the plaintiffs brought claims against Sater and several entities allegedly owned and controlled by Sater or his associates. See generally id. The crux of the plaintiffs' complaint is that Sater conspired with Ilyas to launder the funds allegedly stolen from the plaintiffs through at least five separate investment projects in the United States, namely, the World Health Network, the Trump SoHo Hotel, Creacard S.A., the Syracuse Center, and the Tri-County Mall. Id. ¶¶ 2-3, 66-294. The plaintiffs contend that these five schemes took place during 2013. Id. ¶¶ 120-286.

After extensive pre-trial proceedings, on June 10, 2024, the plaintiffs proceeded to a jury trial on three claims: (1) conversion against Sater alone, (2) unjust enrichment against Sater, Bayrock, GHS, and MeM, and (3) money had and received against Sater, Bayrock, GHS, and MeM. See Joint Pretrial Order, ECF No. 586; Trial Transcript ("Tr."), ECF Nos. 649-72.[2]

During the trial, without any objection from the parties, the jury was instructed that "the statute of limitations on the plaintiffs' claim for conversion against defendant Sater is three years," Tr. 1729, and "that the statute of limitations on the plaintiffs' claims for unjust enrichment is also three

---

[2] The plaintiffs' claims against various other defendants were resolved prior to trial. See ECF Nos. 315, 586, 608, 621.

years," id. at 1729–30.[3] The jury was also instructed that "the statute of limitations on the plaintiffs' claims for money had and received is six years." Id. at 1730.[4] Finally, without objection, the jury was instructed that all of the plaintiffs' claims accrued on the date that "the plaintiffs knew or, in the exercise of reasonable diligence, should have known about the defendant's conduct that gave rise to the claim." Id. at 1729.

The jury ultimately returned a verdict in favor of the plaintiffs and against each of the defendants on all three claims. Id. at 1777–97. With respect to the first count, the jury found that the plaintiffs proved, by a preponderance of the evidence, their conversion claim against Sater. Id. at 1777. Accordingly, the jury awarded $504,212.33 in damages and $20,000,000.00 in punitive damages. Id. at 1777–78. The jury also found that "the earliest ascertainable date that the plaintiffs had a claim for conversion" against Sater was April 2, 2013. Id. at 1732, 1778.

---

[3] There is some uncertainty regarding whether a three-year or six-year statute of limitations applies to claims for unjust enrichment under New York law. See Tech. Opp'y Grp. v. BCN Telecom, Inc., No. 16-cv-9576, 2019 WL 4688628, at *12 (S.D.N.Y. Sept. 25, 2019) (collecting cases). Earlier in this case, at the pleadings stage, the Court held "that a three-year limitations period applies." City of Almaty v. Sater, 503 F. Supp. 3d 51, 66 (S.D.N.Y. 2020) (Nathan, J.), ECF No. 244. That holding is law of the case. Prisco v. A & D Carting Corp., 168 F.3d 593, 607 (2d Cir. 1999).

[4] Counsel for the Sater Defendants had objected that the statute of limitations on the money had and received claims should be three years. Tr. 1469.

4

With respect to the second count, the jury found that the plaintiffs proved, by a preponderance of the evidence, their unjust-enrichment claims against Sater, Bayrock, GHS, and MeM. Id. at 1778–82. Accordingly, the jury awarded damages of $504,212.33 against Sater, $2,031,375.00 against Bayrock, $668,926.50 against GHS, and $343,000.26 against MeM. Id. The jury also found that "the earliest ascertainable date[s] that the plaintiffs had a claim for unjust enrichment" against each of the defendants were in 2013. Id. at 1734, 1778–82.[5]

With respect to the third count, the jury found that the plaintiffs proved, by a preponderance of the evidence, their claims of money had and received against Sater, Bayrock, GHS, and MeM. Id. at 1782–84. Accordingly, the jury awarded damages of $504,212.33 against Sater, $2,031,375.00 against Bayrock, $668,926.50 against GHS, and $343,000.26 against MeM. Id. at 1782–84. The jury also found that "the earliest ascertainable date[s] that the plaintiffs had a claim for . . . money had and received" against each of the defendants were in 2013. Id. at 1734, 1782–84.[6]

---

[5] The earliest ascertainable dates for each defendant were: Sater, April 2, 2013; Bayrock, June 3, 2013; GHS, April 2, 2013; and MeM, August 22, 2013. Tr. 1778–82.

[6] The earliest ascertainable dates for each defendant were: Sater, April 2, 2013; Bayrock, June 3, 2013; GHS, April 2, 2013; and MeM, August 22, 2013. Tr. 1782–85.

The jury further found that Sater, Bayrock, and GHS had failed to prove, by a preponderance of the evidence, the affirmative defense of release. Id. at 1777–84. With respect to the conversion and unjust-enrichment claims, the jury also found that each of the defendants had failed to prove, by a preponderance of the evidence, the affirmative defense of a statute of limitations. Id. at 1777–81. Pursuant to the special verdict form, id. at 1752–59, having answered each statute of limitations question in the negative, the jury did not reach the additional question whether the plaintiffs had proved, by a preponderance of the evidence, that equitable tolling applied to the plaintiffs' claims for conversion and unjust enrichment. See id. at 1777–84.

**B.**

Following the trial, the defendants filed a notice of motion pursuant to Rules 50(b) and 59(a) of the Federal Rules of Civil Procedure. ECF No. 676. The notice of motion listed numerous bases for the motion. Id. The Court thereafter approved the parties' proposed briefing schedule. ECF No. 680.

On August 30, 2024, the defendants filed their Memorandum of Law ("Br."), denominating their motion as only a Rule 50(b) motion. ECF No. 685. The defendants' Memorandum of Law also failed to address many of the grounds raised in their notice of

6

SPA-31

motion. Id.[7] Meanwhile, on August 30, 2024, the plaintiffs submitted a proposed judgment, ECF No. 681, as well as proposed findings of fact and conclusions of law, ECF Nos. 682–84.

At a conference held on September 18, 2024, the defendants expressly withdrew the equitable defenses of unclean hands and in pari delicto. Hearing Transcript ("Hr'g Tr.") 10, ECF No. 692. Accordingly, because the defendants had withdrawn any equitable defenses, the Court determined that it was unnecessary to issue any findings of fact or conclusions of law. Id. at 11.

**II.**

**A.**

A district court should deny a Rule 50 motion unless, "viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached." Cruz v. Loc. Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154–55 (2d Cir. 1994). A trial court considering a motion under Rule 50(b) "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that

---

[7] To the extent that the defendants raised arguments in support of a Rule 59 motion in their notice of motion and failed to support those arguments in their subsequent briefing, those arguments are abandoned. See Jane Doe v. Kathleen Martucci, No. 20-cv-2331, 2024 WL 5118505, at *12 (S.D.N.Y. Dec. 16, 2024).

7

the jury might have drawn in its favor." Samuels v. Air Transp. Loc. 504, 992 F.2d 12, 16 (2d Cir. 1993). A jury verdict should be set aside only when "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or where there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against the movant." Logan v. Bennington Coll. Corp., 72 F.3d 1017, 1022 (2d Cir. 1995).

### B.

Under Rule 59, a "court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Accordingly, "[a] district court may grant a new trial pursuant to Rule 59 even when there is evidence to support the jury's verdict, so long as the court determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." AMW Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 456 (2d Cir. 2009).

### C.

Treated only as a Rule 50(b) motion, the defendants' motion could be denied because the specific grounds in the Rule 50 motion were not raised "before the case [wa]s submitted to the

8

SPA-33

jury." Fed. R. Civ. P. 50(a)(2), (b). "A post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury." Bracey v. Bd. of Educ. of Bridgeport, 368 F.3d 108, 117 (2d Cir. 2004); see also Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008).

Treated as a motion for a new trial pursuant to Rule 59(a)(1)(A), however, there was no requirement to make the motion before the jury retired to deliberate. Fed. R. Civ. P. 59. "A motion for a new trial must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(b). In other words, parties may file a motion for a new trial pursuant to Rule 59(a) at any time before the deadline specified by Rule 59(b). See id. Accordingly, the grounds raised by the defendants on the current motion are considered only under Rule 59(a)(1)(A) as a request for a new trial.

The defendants assert that they are reserving for after the entry of judgment all grounds raised by the defendants' notice of motion in support of a new trial pursuant to Rule 59. Reply ("Rep.") 1, ECF No. 701. But the defendants have already moved for a new trial under Rule 59. ECF No. 676. Therefore, the grounds raised in the notice of motion and not pursued in the briefing have been waived. See Martucci, 2024 WL 5118505, at *12.

9

### III.

Arguing that the plaintiffs' conversion and unjust-enrichment claims accrued in 2013 and expired in 2016, the defendants contend that the jury award on those claims should be vacated. Br. 4-9; Rep. 1-6. The plaintiffs disagree, arguing that the jury verdict determined only the "earliest ascertainable date" for calculating prejudgment interest under New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") § 5001(b), and not the date on which the plaintiffs' claims accrued for purposes of the statute of limitations. Pltfs' Mem. of Law in Opp. ("Opp.") 7-9, ECF No. 697. The plaintiffs also underscore that none of the parties objected to the instruction regarding accrual for purposes of the statute of limitations. Id.

### A.

As a threshold matter, the defendants' failure to object affects the standard of review. Pursuant to Rule 51, a party may assign error based on an erroneous jury instruction "if that party properly objected." Fed. R. Civ. P. 51(d)(1). To object properly "to an instruction or the failure to give an instruction," a party "must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). "A jury charge is erroneous if it misleads the jury as to the correct legal

10

SPA-35

standard, or if it does not adequately inform the jury of the law." Hathaway v. Coughlin, 99 F.3d 550, 552 (2d Cir. 1996). Where a party has objected properly to an erroneous instruction, courts "grant a new trial if the error is not harmless." Dancy v. McGinley, 843 F.3d 93, 116 (2d Cir. 2016). "If, however, the challenging party failed to object to the charge at trial, [courts] review for plain error, that is 'if the error affects substantial rights.'" Rasanen v. Doe, 723 F.3d 325, 332 (2d Cir. 2013) (quoting Fed. R. Civ. P. 51(d)(2)).

During the trial, the jury was instructed that the plaintiffs' claims accrued on the date that "the plaintiffs knew or, in the exercise of reasonable diligence, should have known about the defendant's conduct that gave rise to the claim." Tr. 1729. No party objected to that instruction, properly or otherwise. See id. Because the defendants failed to object to the jury instruction regarding accrual, the present review is for plain error. Rasanen, 723 F.3d at 332–33.

**B.**

To demonstrate plain error, the defendants must show that "there was '(1) error, (2) that is plain, (3) that affects substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Keeling v. Hars, 809 F.3d 43, 51 (2d Cir. 2015) (quoting United States v. Weintraub, 273 F.3d 139, 145 (2d Cir.

11

2001)). However, "the plain error exception to Rule 51's objection requirement 'should only be invoked with extreme caution in the civil context.'" Rasanen, 723 F.3d at 333 (quoting Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 18 (2d Cir. 1996)). "To constitute plain error" in a civil case, "a court's action must affect substantial rights, contravene an established rule of law, and go to the very essence of the case." Emamian v. Rockefeller Univ., 971 F.3d 380, 388 (2d Cir. 2020).

In this case, the instruction regarding accrual contained an error that was plain. Namely, the instruction contravened the established rule under New York law for measuring the accrual date for conversion and unjust-enrichment claims.

Generally, under New York law, the statute of limitations "begins to run once a cause of action accrues, that is, when all of the facts necessary to the cause of action have occurred." Aetna Life and Cas. Co. v. Nelson, 492 N.E.2d 386, 389 (N.Y. 1986); ACE Sec. Corp. v. DB Structured Prods., Inc., 36 N.E.3d 623, 630 (N.Y. 2015); see also N.Y. C.P.L.R. § 203(a). Conversion claims accrue on "the date the conversion takes place and not from discovery or the exercise of diligence to discover." Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso, 660 N.E.2d 1121, 1126 (N.Y. 1995); Grosz v. Museum of Modern Art, 772 F. Supp. 2d 473, 481–82 (S.D.N.Y. 2010). Unjust-

enrichment claims likewise accrue "upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered." Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 364 (2d Cir. 2013) (quoting Coombs v. Jervier, 906 N.Y.S.2d 267, 269 (App. Div. 2010)); Elliott v. Qwest Comms. Corp., 808 N.Y.S.2d 443, 445–46 (App. Div. 2006). In short, under New York law, neither conversion nor unjust enrichment are subject to a discovery rule. Therefore, by providing a discovery rule, the accrual instruction "contravene[d] an established rule of law." See Rasanen, 723 F.3d at 333.

In summation, the plaintiffs' counsel compounded the error. He stressed, incorrectly, that for purposes of the statute of limitations, the defendants had to prove that the plaintiffs knew or should have known about their claims but failed to bring such claims within the statute of limitations. See Tr. 1685–86. Applying that incorrect premise, the plaintiffs' counsel argued that "there is no statute of limitations issue" because the plaintiffs allegedly did not know about their claims against the defendants until 2017. Id. When addressing the earliest ascertainable dates from which the plaintiffs had claims, however, the plaintiffs' counsel provided the jury with the 2013 dates when each of the defendants received the stolen funds. Id. at 1704.

The jury ultimately used those precise dates, finding that the earliest ascertainable dates that the plaintiffs had claims against each of the defendants were in 2013. Id. at 1778–84. Therefore, the jury plainly found that the plaintiffs' claims accrued in 2013. See id. Accordingly, the limitations period to bring conversion and unjust-enrichment claims expired in 2016. N.Y. C.P.L.R. § 214; City of Almaty, 503 F. Supp. 3d at 64–66. The plaintiffs, however, brought this action in 2019, about three years too late. ECF No. 1.

But because of the erroneous accrual instruction, despite finding that the earliest ascertainable dates were in 2013, the jury also found that each of the defendants had failed to prove the affirmative defense of a statute of limitations on the conversion and unjust-enrichment claims. Tr. 1777–81. Consequently, the jury did not reach the issue of whether the statute of limitations for the plaintiffs' conversion and unjust-enrichment claims should be equitably tolled against any of the defendants. See id. at 1777–84.

In short, the error "affect[ed] substantial rights" in a way that went "to the very essence of the case." See Emamian, 971 F.3d at 388. Entry of judgment in the plaintiffs' favor would contravene the jury's finding that the earliest ascertainable dates on which the conversion and unjust-enrichment claims accrued were in 2013, id. at 1778–82, in

14

violation of New York state law, Vigilant, 660 N.E.2d at 1126; Cohen, 711 F.3d at 364. On the other hand, entry of judgment in the defendants' favor would fail to recognize that the error prevented the jury from reaching the plaintiffs' claim that equitable estoppel foreclosed each of the defendants from asserting the statute of limitations defense. Tr. 1777–82. Hence, the accrual instruction constituted plain error under Rule 51(d)(2), meriting a new trial on the plaintiffs' conversion and unjust-enrichment claims.

In response, the plaintiffs contend that the jury determined the earliest ascertainable dates only with respect to the date from which pre-judgment interest should accrue pursuant to N.Y. C.P.L.R. § 5001(b). Armed with that correct observation, the plaintiffs argue that the 2013 dates determined by the jury are not the dates of accrual for the plaintiffs' conversion and unjust-enrichment claims.

But the plaintiffs never defend the proposition that a discovery rule exists for claims of conversion and unjust enrichment; instead, the plaintiffs assume that the statute of limitations for conversion and unjust enrichment accrued when the plaintiffs discovered or should have discovered those torts. That is plainly not the law in New York. See Vigilant, 660 N.E.2d at 1126; Cohen, 711 F.3d at 364. The charge asked the jury to find, and the jury did find, "the earliest ascertainable

15

SPA-40

date that the plaintiffs had a claim for conversion" and "for unjust enrichment" against each of the defendants. Tr. 1732, 1734, 1778-82. Without the discovery rule, the claims accrued when the jury found they did, namely, in 2013. See id. Moreover, the plaintiffs themselves alleged and then maintained throughout this case that the defendants' acts underlying the conversion and unjust-enrichment claims occurred, at the latest, in 2013. See AC ¶¶ 120-286; Tr. 1704. The jury verdict only confirmed that any such acts occurred in 2013.

The cases relied on by the plaintiffs show only that in some cases, pre-judgment interest and the statute of limitations can accrue from different dates. See Am. Bldg. Maint. Co. of Cal. Inc. v. Fed'n Bank & Tr. Co., 213 F. Supp. 412, 416-17, 419-21 (S.D.N.Y. 1963) (finding that interest accrued from the date the plaintiff provided notice of check forgery to the defendant bank, where the applicable statute of limitations barred claims that accrued more than two years prior to the date of notice); Van Vliet v. Kanter, 124 N.Y.S. 63, 64-65 (App. Div. 1910) (holding that, although a contractual claim accrues when the note becomes due, contractual interest accrues only after the plaintiff makes a demand). These cases do not alter the absence of a discovery rule for conversion and unjust-enrichment claims under New York law.

16

SPA-41

In sum, the jury found in favor of the plaintiffs on the time-barred conversion and unjust-enrichment claims. And the issue of equitable estoppel remains undecided with respect to each of the defendants. Therefore, there must be a new trial on the plaintiffs' conversion and unjust-enrichment claims. Accordingly, the defendants' motion for a new trial pursuant to Rule 59(a)(1)(A) on the claims for conversion and unjust enrichment is **granted.**

### IV.

The defendants raise additional arguments in support of a new trial on the plaintiffs' claims. None of these arguments have merit.[8]

### A.

The Sater Defendants claim that judgment should be entered dismissing all claims against them because those defendants are covered by the "Release" contained in the Confidential Assistance Agreement ("CAA") dated June 12, 2015. Br. 9–10. The CAA was "entered into" by, as relevant here, Litco LLC ("Litco"), Almaty, and BTA. PX-593, ECF No. 684-34 (CAA). The Sater Defendants were not named parties to the CAA. See id.

Pursuant to the CAA, Litco agreed to "provide information, assistance, and cooperation" with respect to "investigative and

---

[8] The defendants previously asserted the affirmative defenses of unclean hands and in pari delicto. See Br. 12–13. The defendants have waived those defenses. Hr'g Tr. 10; Rep. 1.

17

asset recovery efforts" against entities owned or controlled by Khrapunov and Ablyazov. Id. at 1. Pursuant to the Release, in relevant part, Almaty and BTA released and discharged Litco and its shareholders from all known and unknown claims and liabilities. Id. at 4. In entering the CAA, however, Litco had represented and warranted that "[n]o potential witness which Litco identifies and produces . . . shall have any ownership interest in Litco." Id. at 3.

The Sater Defendants' argument for dismissal based on release fails because the jury rejected the defense of release with respect to each of the Sater Defendants. Tr. 1777–84. For the following reasons, that jury determination was supported amply by the record.

First, the evidence showed that the Release was fraudulently induced. The CAA's terms expressed an intent to exclude from the Release any witness with any ownership interest in Litco. PX-593 at 3. But at trial, the plaintiffs introduced evidence that Sater, a potential Litco witness, concealed that he owned Litco until after the formation of the CAA. See Tr. 310–11. Indeed, during his opening statement, Sater's counsel acknowledged that Sater kept his identity as Litco's owner hidden from "low-level functionaries at" BTA and Almaty by, for instance, having someone else sign the CAA on behalf of Litco. Id. at 114–15; see also id. at 1059–60. Therefore, there was

18

SPA-43

evidence in the record from which the jury could conclude reasonably that the Release was fraudulently induced.

Moreover, during the trial, Robert Wolf, Litco's lawyer during the negotiation and formation of the CAA, took the witness stand. Tr. 1022, 1073-98. Wolf testified that as recently as the day before the plaintiffs' 2018 deposition of Sater in a related case, Wolf represented to the plaintiffs' counsel that Wolf did not know who owned Litco. Id. at 1326-29. The jury also heard testimony that the Magistrate Judge in the related action found, after an evidentiary hearing, that Sater and Wolf knowingly concealed from the plaintiffs Sater's identity as Litco's owner and made express representations about Litco's ownership that were false. Id. at 1351; see also City of Almaty v. Ablyazov, No. 15-cv-5345, 2020 WL 13558984, at *14 (S.D.N.Y. May 19, 2020), ECF No. 1248, overruled in other part by 2020 WL 5269554 (S.D.N.Y. Sept. 3, 2020), ECF No. 1333. With respect to testimony offered by Sater suggesting anything to the contrary, "[t]he jury was entitled" to find Sater and Wolf "not credible and to disregard anything or everything they said." Exodus Partners, LLC v. Cooke, No. 4-cv-10239, 2007 WL 120053, at *6 (S.D.N.Y. 2007). Accordingly, the record amply supported the jury's rejection of the release defense based on fraudulent inducement.

Second, it was reasonable for the jury to find that the Sater Defendants were not third-party beneficiaries of the Release. During the trial, the jury was instructed specifically that Sater and his companies could not claim the Release's protection if they were not third-party beneficiaries. Tr. 1727–28; see also LaSalle Nat'l Bank v. Ernst & Young LLP, 729 N.Y.S.2d 671, 676 (App. Div. 2001) (finding that a nonparty may sue for breach of contract only when "the parties' intent to benefit the third party [is] apparent from the face of the contract").

It is undisputed that Sater did not negotiate the CAA on Litco's behalf; indeed, Sater had another person sign the CAA on behalf of Litco. Tr. 114–15; see also id. at 428, 1059–60. Because the evidence showed that the plaintiffs did not know about Sater's ownership of Litco when the plaintiffs entered into the CAA, it was reasonable for the jury to find, by a preponderance of the evidence, that the plaintiffs did not intend for the CAA to benefit the Sater Defendants. The jury was not required to accept the self-serving testimony of Sater and Wolf that the parties to the CAA intended for Sater to be released. Exodus Partners, 2007 WL 120053, at *6.

Based on the CAA's plain terms and the evidence in the record, the jury reasonably found that the defendants had failed

20

to prove, by a preponderance of the evidence, the affirmative defense of release. A new trial on that issue is unwarranted.

**B.**

The defendants argue that the testimony of Seth Fliegler, the plaintiffs' forensic-accounting expert witness, "fatally undermined" the plaintiffs' case. Br. 10–11. The defendants contend that Fliegler "'guessed' that the allegedly stolen funds had originally been stolen from BTA depositors." Id. at 11.

Fliegler, however, clearly testified that, whether BTA collected the money from depositors, investments, or some other source, the money that the defendants tortiously obtained was in fact stolen from BTA. See, e.g., Tr. 931 (Fliegler testifying that the jury "should focus on the fact that the source of the funds was from BTA"). When asked how he established that BTA was the source of the funds, Fliegler answered, "through transactional data and agreements." Id. On the other hand, Sater testified merely that the funds he obtained belonged to the Khrapunov family and that Sater did not know and did not care where else the money came from. Id. at 798, 1215. Because Fliegler clearly testified that the money was stolen from BTA, and the jury was entitled to credit that testimony, the defendants' argument is without merit.

21

SPA-46

### c.

The defendants argue that the charge and the special verdict form erred by failing to distinguish between BTA and Almaty. Br. 11–12; Rep. 8–10.

This argument is without merit. Earlier in this case, the defendants themselves proposed jury instructions that referred to BTA and Almaty together as "Plaintiffs." ECF No. 524 (Sater Defendants); ECF No. 537 (MeM). But at the charge conference, the defendants requested for the first time that the Court treat the plaintiffs separately in the charge and special verdict form. Tr. 1440–41. The plaintiffs objected, arguing that the plaintiffs could present their evidence and receive a verdict jointly. Id. at 1441–42. In support of this argument, the plaintiffs relied on Cargill, Inc. v. WDS, Inc., No. 316-cv-848, 2018 WL 1525352, at *10 (W.D.N.C. Mar. 28, 2018). Id.

The Court agreed with the plaintiffs and ruled that because "the case has been tried with respect to the plaintiffs together" and the evidence showed that the money stolen from the plaintiffs "moved together through the system," "it would be difficult in this case and confusing [to the jury] to try and separate out [the plaintiffs]." Id. at 1443.

The defendants have failed to present any colorable reason to overturn that earlier ruling. The out-of-circuit cases relied on by the defendants are consonant with the Court's earlier

22

ruling; any judgment for the plaintiffs and against any of the defendants would provide "an identification of the parties for and against whom judgment is being entered." See Penn Terra Ltd. V. Dep't of Env't Res., 733 F.2d 267, 275 (3d Cir. 1984). And the defendants' attempt to distinguish Cargill fails. Although Cargill involved a parent-company plaintiff suing alongside its wholly owned subsidiary, Cargill's reasoning applies with equal force to this case. 2018 WL 1525352, at *1, *10.

Just as in Cargill, the plaintiffs' "claims arose from the same set of facts." 2018 WL 1525352, at *10. The evidence in the record showed that the defendants had tortiously obtained funds that were originally stolen from BTA or Almaty. See Plaintiffs' Proposed Findings of Fact ¶¶ 12–64; 76–78, ECF No. 682 (citing testimony & exhibits). The evidence also showed that the defendants then intermingled the funds originally stolen from Almaty and BTA. See id. ¶¶ 83–225 (citing testimony & exhibits).

It was therefore appropriate to "set out early in the trial that [the p]laintiffs were two separate entities," but thereafter, "reference[] them collectively as [p]laintiffs." Cargill, 2018 WL 1525352, at *10. No legal or practical reason prevented the case from being tried jointly as to the two plaintiffs without distinction as to how much of the total recovery should be appropriated to each plaintiff. Id.; Inter Med. Supplies Ltd. V. EBI Med. Sys. Inc., 975 F. Supp. 681, 691

(D.N.J. 1997). Accordingly, the jury properly awarded a total sum to both plaintiffs and against each of the defendants.

**D.**

The defendants argue that the punitive damages award against Sater must be vacated. Br. 13-16; Rep. 6-7. This argument is moot because the jury awarded punitive damages against Sater only on the plaintiffs' conversion claim. See Tr. 1777-84. Because the jury award on that claim must be vacated and a new trial provided, the defendants' request for vacatur of the punitive damages award against Sater is **denied** as moot.

**F.**

Finally, the defendants argue that the award of compensatory damages against the various defendants involved double or triple counting. Br. 16-19; Rep. 7-8. The opposite is true.

The jury was instructed as follows:

> [Y]ou should not award damages more than once for the same injury. For example, if the plaintiffs were to prevail on multiple claims and establish a one dollar injury, you should not award them one dollar compensatory damages on each claim -- the plaintiffs are only entitled to be made whole, not to recover more than they lost.

Tr. 1734. The Court also reiterated, "Remember that the amount of damages that you award may not exceed the total amount of damages incurred by the plaintiffs." Tr. 1753.

24

SPA-49

During its deliberation, the jury carefully followed that instruction. With respect to Bayrock, GHS, and MeM, and to a lesser extent Sater, the jury accepted Fliegler's testimony regarding the total amount of the plaintiffs' loss attributable to each of the defendants. See PTX-801 at 27, ECF No. 684-39. Then, to avoid double or triple counting damages for the same injury, even if occasioned by separate wrongs, the jury divided up the actual damages among the two or three theories of liability. See Tr. 1777-84.

With respect to the money had and received claim, the jury awarded the plaintiffs compensatory damages in the following amounts: $504,213.33 against Sater; $2,031,375.00 against Bayrock; $668,926.50 against GHS; and $343,000.26 against MeM. Tr. 1782-84. When doubled, the amounts awarded against Bayrock, GHS, and MeM almost exactly equal the total damages attributed by the plaintiffs' expert to each of the three defendants. PTX-801 at 27. Plainly, after finding each of Bayrock, GHS, and MeM liable for nearly the total amount determined by the plaintiffs' expert, the jury spread the totals across unjust enrichment and money had and received, the two theories of liability for which Bayrock, GHS, and MeM were found liable. See Tr. 1782-84.

Similarly, with respect to Sater, the jury found that the appropriate award of damages for the money had and received count was $504,213.33. Id. at 1782. On the other two counts, the

25

SPA-50

jury likewise found Sater liable for $504,212.33 in nonpunitive damages. Id. at 1777–78. The jury plainly spread the total amount of nonpunitive damages that the jury found against Sater across the three counts for which the jury found Sater liable. See id. at 1777–82.

The jury plainly calculated damages pursuant to the jury charge to avoid awarding additional damages for the same factual injury. See id. at 1753, 1777–82. And although the nonpunitive damages amount that the jury found Sater liable for was considerably less than the amount determined by the plaintiffs' expert, $16,587,640, Sater can hardly complain that the jury awarded less nonpunitive damages than the evidence indicated Sater had caused. See PTX-801 at 27.

Accordingly, the defendants' assertion that the jury double or triple counted damages is without merit. Although the jury awards on the conversion and unjust-enrichment counts must be vacated for the reasons explained above, because a new trial is unwarranted on the money had and received count, the damages award on the that count **remains valid.**

### V.

Because the Court has awarded a new trial on the plaintiffs' claims for conversion and unjust enrichment, the proposed judgment submitted by the plaintiffs is now moot. Moreover, there is no "just reason" to issue a judgment solely

on the money had and received claim. See Fed. R. Civ. P. 54(b). Therefore, any application to enter the plaintiffs' proposed judgment is **denied as moot**.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the reasons explained above, the defendants' motion pursuant to Rule 59(a)(1)(A) for a new trial on the plaintiffs' claims for conversion and unjust enrichment is **granted**. The defendants' motion for judgment pursuant to Rule 50(b) on those claims is **denied**. The defendants' motion for a new trial pursuant to Rule 59 or for judgment pursuant to Rule 50(b) on the plaintiffs' claim for money had and received is **denied**.

The parties should submit a joint status report by **January 27, 2025**.

The Clerk is directed to close ECF No. 676.

**SO ORDERED.**

Dated:     **New York, New York**
           **January 15, 2025**

                                    _____
                                        **John G. Koeltl**
                              **United States District Judge**

27

SPA-52

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
─────────────────────────────────

**CITY OF ALMATY, KAZAKHSTAN, ET AL.,**

                    **Plaintiffs,**          **19-cv-2645 (JGK)**

      **- against -**          **MEMORANDUM OPINION AND**
                            **ORDER**

**FELIX SATER, ET AL.,**

                    **Defendants.**
─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

The plaintiffs, the City of Almaty, Kazakhstan ("Almaty"), and BTA Bank JSC ("BTA"), brought this action against various defendants, including Felix Sater, Bayrock Group Inc. ("Bayrock"), Global Habitat Solutions Inc. ("GHS") (together with Sater and Bayrock, the "Sater entities"), and MeM Energy Partners LLC ("MeM") (collectively, the "defendants"). After a nearly three-week trial, the jury returned a verdict in favor of the plaintiffs and against each of the defendants. In January 2025, this Court granted the defendants' motion pursuant to Federal Rule of Civil Procedure 59 for a new trial on the plaintiffs' claims for conversion and unjust enrichment. See ECF No. 702; City of Almaty v. Sater, No. 19-cv-2645, 2025 WL 218838 (S.D.N.Y. Jan. 15, 2025).

The defendants now move for summary judgment dismissing these claims pursuant to Federal Rule of Civil Procedure 56. See Notice of Mot., ECF No. 733. The defendants argue that the

1

SPA-53

plaintiffs' claims are barred by the respective statutes of limitations and that the defendants are not foreclosed from asserting the statute of limitations by equitable estoppel. The defendants claim that the Court can determine as a matter of law that equitable estoppel does not apply to the facts of this case. The defendants have also filed a "conditional motion to disqualify" Boies Schiller as trial counsel. See Defs. Br. at 16-18, ECF No. 734. For the following reasons, the defendants' motions are **denied.**

**I.**

The Court assumes familiarity with the history of this case, which has been described in previous opinions. See, e.g., ECF Nos. 244, 323, 392, 396, 625, 702. The following summary sets forth only those facts necessary to resolve this motion.

Unless otherwise noted, the following facts are taken from the parties' Local Rule 56.1 Statements and supporting papers and are undisputed.[1]

**A.**

The plaintiffs allege that Viktor Khrapunov ("Khrapunov"), the former mayor of Almaty, misappropriated funds from Almaty through fraudulent means. Second Am. Compl. ("SAC") ¶¶ 53-62, ECF No. 399. The plaintiffs also allege that Mukhtar Ablyazov,

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

2

the former chairman of BTA, stole funds from BTA by causing BTA to make sham loans to companies that Ablyazov owned. Id. ¶¶ 16-49. Ablyazov allegedly turned to Ilyas Khrapunov ("Ilyas"), Khrapunov's son and Ablyazov's son-in-law, to help launder these stolen funds. Id. ¶¶ 50-52. The plaintiffs allege that Khrapunov also laundered the funds stolen from Almaty with the aid of Ablyazov, through Ablyazov's control of BTA and a vast network of shell companies. Id. ¶¶ 56-57.

The plaintiffs claim that Sater, a long-time associate of the Khrapunov family, conspired with Ilyas to launder the stolen funds through real estate investments in the United States. Id. ¶¶ 82, 106. Sater allegedly enlisted in this laundering scheme several entities wholly owned and controlled by him, as well as various associates and entities owned and controlled by those associates, including MeM, which is owned and controlled by Mendel Mochkin. See id. ¶¶ 6-12, 287-94.

**B.**

At the crux of this case is an alleged laundering scheme that involved at least five investment projects—namely, the Tri-County Mall, the World Health Networks, the Trump SoHo Hotel, the Syracuse Center, and Creacard S.A. Id. ¶¶ 2-3, 119-286.

The Tri-County Mall scheme involved the April 2013 purchase and July 2013 resale of a note on the Tri-County Mall in Ohio by Tri-County Mall Investors LLC ("TCMI"), an entity controlled by

3

SPA-55

Sater, Ilyas, and Triadou SPV S.A. ("Triadou"), TCMI's sole member and an alleged front for Khrapunov and Ablyazov. See id. ¶¶ 211, 249; Defs. Local Rule 56.1 Statement ("Defs. 56.1") ¶ 1, ECF No. 733; Pltfs. Responses to Defs. 56.1 ("Pltfs. 56.1") ¶¶ 1, 62, ECF No. 746. Sater structured the Tri-County Mall transaction to conceal the true ownership and source of the allegedly stolen funds used to purchase the note. Pltfs. 56.1 ¶¶ 62-63. According to Sater, the Tri-County Mall investment was "extremely successful," turning $28.5 million into $43 million in three months. Defs. 56.1 ¶ 1.[2]

However, the partnership between Sater and Ilyas went south. Id. ¶¶ 2-3. Sater diverted over $36 million of the Tri-County Mall sale proceeds to a bank account that only he controlled. Id. ¶ 3.

On December 19, 2013, TCMI sued Sater in a New York state court, seeking to recover the misappropriated proceeds (the "2013 Lawsuit"). Id. ¶¶ 4, 14; see also Ex. A to Decl. of John H. Snyder ("Snyder Decl."), ECF No. 735-1. That same day, Nicolas Bourg filed an affidavit in the 2013 Lawsuit, stating in relevant part that he was "the president of the sole member of

---

[2] The plaintiffs dispute these numbers, asserting that "the gross profit figure does not account for the money that Defendants misappropriated and stole from TCMI" in connection with the purchase and resale of the note. Pltfs. 56.1 ¶ 1.

4

[TCMI]." Defs. 56.1 ¶¶ 15–16; Ex. B to Snyder Decl., ECF No. 735-2.[3]

The next day, on December 20, TCMI filed a notice of discontinuance. Pltfs. 56.1 ¶ 14. TCMI voluntarily withdrew the 2013 Lawsuit after Sater and TCMI entered into a confidential settlement agreement whereby Sater agreed to return $20 million of the proceeds that he had allegedly misappropriated in exchange for TCMI's relinquishment of its claim to a majority of the sales proceeds, as well as mutual releases and a non-disclosure agreement. Id. As a result of the settlement, Sater was able to retain over $16 million of the proceeds that he had diverted. Defs. 56.1 ¶¶ 5, 13. The settlement agreement was not filed publicly on the 2013 Lawsuit docket, and the notice of discontinuance—which was filed publicly on the docket—did not indicate that there had been a settlement or what the terms of the settlement were. Pltfs. 56.1 ¶ 14. The plaintiffs assert that they did not learn about the settlement agreement until a 2017 deposition in a related case, BTA Bank v. Triadou SPV S.A., No. 15-cv-5345 (S.D.N.Y.) (the "Triadou Action"). Id.

The plaintiffs claim that the World Health Networks, Trump SoHo Hotel, Syracuse Center, and Creacard S.A. investments were

---

[3] Although the defendants claim that Ilyas "caused" TCMI to commence the 2013 Lawsuit, "TCMI" was the plaintiff, and the complaint in that action and the supporting affidavit make no mention by name of "Ilyas", any member of the Khrapunov family, Ablyazov, Triadou, or the plaintiffs. See Pltfs. 56.1 ¶ 14; Exs. A & B to Snyder Decl.

other examples of similar schemes run by the defendants to launder the stolen funds in ways that enriched the defendants and obscured the true source of the funds. See id. ¶¶ 56-67.

### c.

In early 2015, a lawyer named Robert Wolf approached Latham & Watkins ("Latham"), which was representing Almaty at the time in litigation against the Khrapunov family. Id. ¶ 37. Wolf offered Latham the services of his client, a company called Litco LLC ("Litco"), to assist Almaty in recovering funds. Id. Latham signed a non-disclosure agreement ("NDA") stating that it would not "discuss, disclose, or otherwise transfer" the identities of the "persons having ownership interests" in Litco to "any person or entity, including, without limitation, Almaty." Id. ¶ 38. After Latham signed the NDA, Wolf disclosed that Sater was the sole member of Litco. Id. Latham declined to engage Litco on behalf of Almaty. Id. ¶ 39.

Wolf then contacted Peder Garske, a partner at Arcanum (Asia) Limited ("Arcanum"), an investigative firm working with the plaintiffs on the plaintiffs' asset recovery efforts. Id. ¶¶ 39-40. On behalf of Litco, Wolf offered to provide the plaintiffs with investigative and litigation assistance with locating and recovering funds stolen from the plaintiffs through Ablyazov's and Khrapunov's fraud. Id. ¶ 40. At that point,

6

Arcanum dealt solely with Wolf; no one at Arcanum dealt with any other representative of Litco. Id. ¶ 41.

On June 12, 2015, Litco entered into a Confidential Assistance Agreement (the "CAA") with Arcanum and the plaintiffs. Id. ¶¶ 41–42. The CAA granted Litco a contingent interest in recoveries that resulted from Litco's assistance. Id. ¶ 42; Ex. C to Snyder Decl. ("CAA") § 2, ECF No. 735-3. Litco also represented and warranted to Arcanum that "[n]o potential witness which Litco identifies and produces to Arcanum in connection with assistance to be provided under this Agreement shall have any ownership interest in Litco." CAA § 6(e). Sater was not a signatory to, nor was he mentioned anywhere in, the CAA. Pltfs. 56.1 ¶ 43. Instead, Sater's associate, Karlson Kam, signed the CAA on Litco's behalf. Id.

On July 8, 2025, Litco and Arcanum entered into a non-disclosure agreement (the "Arcanum NDA"). Id. ¶ 44; Ex. CC to Schwartz Decl. ("Arcanum NDA"), ECF No. 747-23. The Arcanum NDA prohibited Arcanum from disclosing to the plaintiffs or the plaintiffs' counsel "the identities of Litco's members, or other persons having ownership interests in Litco," to the extent that this information was disclosed to Arcanum; and from proffering Sater "as a potential witness in any action contemplated by the [CAA]." Arcanum NDA ¶¶ 1–2. According to Wolf, the purpose of hiding Sater's name from the plaintiffs was to "keep Mr. Sater

7

SPA-59

out of it" and to ensure that Sater "would not be produced as a witness to Arcanum or anyone." Pltfs. 56.1 ¶ 45.

After Arcanum signed the NDA, at which point Arcanum was bound not to disclose Sater's identity to the plaintiffs, Sater met with Wolf and Garske from Arcanum (the "Garske meeting").[4] Id. ¶ 46. The plaintiffs claim that this meeting took place on July 8, 2015, while Sater asserts that it occurred in early June 2015. Id.; Defs. 56.1 ¶ 21. The defendants claim that, at this meeting, Sater told Garske about the circumstances surrounding Sater's diversion of the Tri-County Mall proceeds, as well as the fact that Sater ultimately retained some of these proceeds. Defs. 56.1 ¶¶ 25-26. In the defendants' view, the audio recording of the Garske meeting establishes that Garske was in communications with Bourg, the sole director of Triadou, and that Garske had discussed the Tri-County Mall deal—including who received proceeds from the deal—with Bourg. See id. ¶¶ 15, 27-28. According to the defendants, at that meeting, Sater also suggested to Garske that certain information about the Tri-County Mall deal would be better disclosed by Bourg because Sater had signed a confidentiality agreement with Ilyas, while Bourg had not. Id. ¶ 30.

---

[4] The plaintiffs have moved in limine to preclude any evidence regarding this meeting, including the audio recording and transcript of this meeting. See ECF No. 727. The Court will address that motion in a separate ruling.

The plaintiffs have a different view of the evidence of the Garske meeting. By the plaintiffs' telling, Sater and Garske primarily discussed transactions that are not at issue in this case. Pltfs. 56.1 ¶ 46.

**D.**

In October 2015, the plaintiffs filed an answer, counterclaims, and crossclaims (the "Crossclaims") in the Triadou Action. No. 15-cv-5345, ECF No. 49. At issue in the Crossclaims was an investment involving the Flatotel property located in New York City—a transaction that is not at issue in this case. See Pltfs. 56.1 ¶¶ 51–53. The Crossclaims alleged that Ablyazov and Khrapunov, through Triadou, partnered with Ilyas and real estate developer Joseph Chetrit to launder funds stolen from the plaintiffs through the Flatotel investment. See Crossclaims ¶¶ 19, 101–07; Pltfs. 56.1 ¶¶ 51–53.

The Crossclaims do not mention Sater, his entities, MeM, or any of the transactions at issue in this case. Id. ¶ 54; see generally Crossclaims. The plaintiffs have never alleged that Sater received any of the Flatotel funds. Pltfs. 56.1 ¶ 54. But the Crossclaims do mention Bourg 41 times in connection with Bourg's activities with Triadou. See generally Crossclaims; see also Defs. 56.1 ¶ 32. And in May 2016, Bourg filed a declaration in support of the plaintiffs' motion for attachment of Triadou's assets in the Triadou Action. No. 15-cv-5345, ECF No. 142

("Bourg Decl."). In that declaration, Bourgh stated that, in April 2013, Triadou invested approximately $29 million in the Tri-County Mall and resold that interest three months later for approximately $340 million, but that "those funds did not flow to Triadou, but were instead moved to other Ablyazov-Khrapunov entities and then out of the United States." Id. ¶ 44; see also Pltfs. 56.1 ¶ 55. The declaration makes no mention of Sater. See generally Bourg Decl.

The defendants assert that "Sater and his personal attorney worked with Arcanum to research and draft the factual allegations of the Crossclaims . . . filed by Boies Schiller on behalf of the Plaintiffs." Defs. 56.1 ¶ 31. The plaintiffs dispute this assertion insofar as it suggests that any assistance Litco may have provided in connection with the Crossclaims concerned Sater's participation in the money laundering scheme or that Sater gave information directly to Boies Schiller. Pltfs. 56.1 ¶ 31.

**E.**

The plaintiffs commenced this action on March 25, 2019. ECF No. 1. On June 10, 2024, the parties proceeded to a jury trial on three claims: conversion against Sater; unjust enrichment against Sater, Bayrock, GHS, and MeM; and money had and received against Sater, Bayrock, GHS, and MeM. See Joint Pretrial Order, ECF No. 586; Trial Transcript ("Tr."), ECF Nos. 649-72. The jury

10

returned a verdict in favor of the plaintiffs and against each of the defendants on the claims in which they were named. Tr. at 1777-97. The jury also found that the earliest ascertainable dates that the plaintiffs had claims for conversion and for unjust enrichment against the defendants were in 2013. See id. at 1732, 1734, 1778-82. In other words, the jury found that the plaintiffs' claims accrued in 2013. See id. at 1778-84.

With respect to the conversion and unjust enrichment claims, the jury found that the defendants had failed to prove the affirmative defense of a statute of limitations. Id. at 1777-81. Having answered each statute of limitations question on the special verdict form in the negative, the jury did not reach the additional question whether the plaintiffs had proved that equitable estoppel applies to the plaintiffs' claims for conversion and unjust enrichment. See id. at 1777-84.

On January 15, 2025, this Court granted the defendants' motion pursuant to Rule 59 for a new trial on the plaintiffs' claims for conversion and unjust enrichment. ECF No. 702. The Court concluded that jury was erroneously instructed on accrual of those claims for purposes of the statute of limitations. Id. at 12. The Court observed that, had the jury been given the correct instruction, the jury would have found that the limitations period to bring those claims expired in 2016—three years before the plaintiffs brought this action in 2019. Id. at

11

14. However, because the jury had found that the defendants had failed to prove the affirmative defense of a statute of limitations on those claims, the jury did not decide whether any of the defendants should be equitably estopped from asserting the statute of limitations for those claims. See id.

The defendants have now moved for summary judgment dismissing the plaintiffs' claims for conversion and unjust enrichment. ECF No. 733. The defendants contend that the undisputed facts establish that equitable estoppel is inapplicable to the claims, which would otherwise be time-barred. If summary judgment is denied and the case proceeds to a jury trial, the defendants have moved to disqualify Boies Schiller as trial counsel. See id.

**II.**

**A.**

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in

12

short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

**B.**

Motions to disqualify are "viewed with disfavor in this Circuit because they are often interposed for tactical reasons and result in unnecessary delay." Bennett Silvershein Assocs. v.

13

SPA-65

Furman, 776 F. Supp. 800, 802 (S.D.N.Y. 1991); see also Finkel

Frattarelli Bros., Inc., 740 F. Supp. 2d 368, 372 (E.D.N.Y.

2010). In exercising the discretionary power to disqualify

counsel, courts look to the American Bar Association and state

disciplinary rules for guidance. Finkel, 740 F. Supp. 2d at 372.

The advocate-witness rule can serve as grounds for

disqualification. See id.; N.Y. Rules of Professional Conduct R.

3.7(a). That rule provides that "[a] lawyer shall not act as

advocate before a tribunal in a matter in which the lawyer is

likely to be a witness on a significant issue of fact." Finkel,

740 F. Supp. 2d at 372–73. Disqualification pursuant to Rule

3.7(a) is warranted only where: (1) the testimony given by

counsel is "necessary"; and (2) "there is a substantial

likelihood that the testimony would be prejudicial to the

witness-advocate's client." Id.; see also Capponi v. Murphy, 772

F. Supp. 2d 457, 471–72 (S.D.N.Y. 2009).

### III.

The parties share some common ground. It is undisputed that

the statute of limitations for the conversion and unjust

enrichment claims is three years, that the claims accrued in

2013, and that the plaintiffs have the burden of proving that

equitable estoppel prevented the running of the statute of

limitations. In moving for summary judgment, the defendants

argue that equitable estoppel does not apply in this case as a matter of law.

"Under the doctrine of equitable estoppel, 'a defendant is estopped from pleading a statute of limitations defense if the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.'" City of Almaty v. Sater, 503 F. Supp. 3d 51, 66 (S.D.N.Y. 2020) (quoting Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189, 198 (N.Y. 2007)). Equitable estoppel covers "the circumstances where the defendant conceals from the plaintiff the fact that [the plaintiff] has a cause of action." Pearl v. City of Long Beach, 296 F.3d 76, 82 (2d Cir. 2002). In invoking equitable estoppel, the plaintiff "may not rely on the same act that forms the basis for the claim" and must instead point to a distinct act of deception or concealment. Ross, 868 N.E.2d at 198.

The New York Court of Appeals has allowed the application of equitable estoppel where, for example, a defendant's fraudulent accounting practices concealed the plaintiff's losses resulting from the defendant's theft. See Gen. Stencils, Inc. v. Chiappa, 219 N.E.2d 169, 170–71 (N.Y. 1966) (finding that a plaintiff who alleged that the defendant bookkeeper stole petty cash and concealed the theft with forged entries could litigate the issue of equitable estoppel at trial).

15

However, "[t]he doctrine of equitable estoppel will not apply if the plaintiff possesses timely knowledge sufficient to place [the plaintiff] under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations." McIvor v. Di Benedetto, 503 N.Y.S.2d 836, 837 (App. Div. 1986); see also, e.g., Gleason v. Spota, 599 N.Y.S.2d 297, 299 (App. Div. 1993). The plaintiff must "demonstrate [the plaintiff's] due diligence in ascertaining the facts and in commencing the action in order to seek shelter" under the doctrine. MBI Int'l Holdings Inc. v. Barclays Bank PLC, 57 N.Y.S.3d 119, 126 (App. Div. 2017).

The key question is whether the plaintiff's delay in bringing the claim was the result of the defendant's affirmative wrongdoing rather than the plaintiff's own negligence. See Gen. Stencils, 219 N.E.2d at 171.[5]

**A.**

As an initial matter, the defendants in this case fault the plaintiffs for relying on Judge Nathan's 2020 decision on the defendants' motion to dismiss. See City of Almaty, 503 F. Supp. 3d at 67 (finding the plaintiffs' allegations "enough at the pleading stage to plausibly support the application of equitable estoppel"). The defendants argue that Judge Nathan's decision

---

[5] The requirements for equitable estoppel in this case are governed by New York law rather than federal law.

16

was only on a motion to dismiss, and that the decision observed that the plaintiffs "w[ould] need to adduce evidence showing the [defendants'] deceptive conduct and their justifiable reliance on that conduct in significantly greater detail to meet their burdens of production and of proof as the case progresses." Id. at 68. It is true that a motion to dismiss is different from a motion for summary judgment. But that has no bearing on whether there is evidence now to support the application of equitable estoppel.

In addition, the defendants have made no specific arguments regarding MeM and, even as to the Sater entities, have attempted to challenge the application of equitable estoppel only with respect to the funds that the Sater entities received from the Tri-County Mall project—and not the four other investments from which they allegedly benefited, namely the World Health Networks, the Trump SoHo Hotel, the Syracuse Center, and Creacard S.A. On that basis alone, the motion for summary judgment should be denied.

**B.**

The defendants do not appear to dispute that Sater actively concealed his role in the money laundering scheme and his receipt of stolen funds. Rather, the defendants provide three reasons why the plaintiffs nonetheless cannot assert equitable estoppel as a matter of law, contending that the plaintiffs

17

would have become aware of Sater's role if the plaintiffs had exercised diligence because: (1) the facts underlying the plaintiffs' claims were allegedly matters of public record in the 2013 Lawsuit regarding the Tri-County Mall project; (2) Sater allegedly told Arcanum about the Tri-County Mall scheme during the 2015 Garske meeting; and (3) Sater purportedly assisted the plaintiffs with drafting the October 2015 Crossclaims, and the circumstances surrounding the preparation of the Crossclaims should have put the plaintiffs on notice of Sater's wrongdoing.

With respect to the three bases offered by the defendants for why equitable estoppel should not apply, there is at least a dispute of fact as to what the plaintiffs should have known—and when—about their claims against the defendants in connection with the Tri-County Mall scheme.

**1.**

First, the defendants claim that the existence of and the public filings in the 2013 Lawsuit were sufficient to put the plaintiffs on notice of the facts underlying the claims for conversion and unjust enrichment against Sater.

However, the evidence pertaining to the 2013 Lawsuit is insufficient to preclude the defendants' reliance on equitable estoppel as a matter of law. To begin, the defendants fail to explain why, when the lawsuit was filed in 2013, the plaintiffs

18

would have had reason to know about the existence of the lawsuit and that the dispute may have been related to the funds stolen from the plaintiffs. See St. John's Univ. v. Bolton, 757 F. Supp. 2d 144, 191 (E.D.N.Y. 2010) ("A defendant who intentionally conceals facts forming the basis of a plaintiff's claims is no less wrong for having done so, and a plaintiff is no less diligent in protecting his rights, if the plaintiff remains wholly ignorant of evidence of wrongdoing he had no reason to detect—even where that evidence exists in a public record open to all."). The defendants have adduced no evidence that, in 2013, the plaintiffs knew that the proceeds at issue in the 2013 Lawsuit were the stolen funds or that the Tri-County Mall investment was part of the broader money laundering scheme such that the plaintiffs should have been on alert about the existence of lawsuits against Sater or involving the Tri-County Mall. And even if the plaintiffs had discovered the 2013 Lawsuit at the time, it is undisputed that the 2013 Lawsuit's caption— "Tri-County Mall Investors, LLC v. Felix Sater et al."—and associated public filings make no mention of Ilyas, Ablyazov, or even Triadou. See Pltfs. 56.1 ¶ 14; Ex. A to Snyder Decl.

As for the settlement agreement between Sater and TCMI pursuant to which Sater agreed to return $20 million of the diverted proceeds, that does not help the defendants. The settlement agreement was confidential, and it is undisputed that

19

SPA-71

the publicly available filings on the 2013 Lawsuit's docket provided no indication that there had been a settlement, let alone what the terms of the settlement were. Pltfs. 56.1 ¶ 14.

The defendants contend that the plaintiffs could have followed up on the 2013 Lawsuit subsequently, in 2014 and 2015, after the plaintiffs might have had reason to do research on Sater, and learned of the bases for the claims against Sater before 2016, when the statute of limitations expired. See Defs. Reply at 7, ECF No. 753. But the fact that the settlement agreement resolving the 2013 Lawsuit was confidential raises a question of fact as to whether the plaintiffs should have known about their claims against the defendants before the end of the limitations period, or whether the existence of the confidential settlement agreement was part of a deceptive scheme by Sater to prevent the plaintiffs from becoming aware of their claims against him.

**2.**

Second, the defendants claim that, in a 2015 meeting, Sater told Garske of Arcanum, which had been engaged by the plaintiffs to locate and recover the stolen funds, about Sater's diversion of funds from the Tri-County Mall project. The defendants further assert that, at the Garske meeting, Sater acknowledged that he had signed a confidentiality agreement with Ilyas, but suggested that Garske speak with Bourg, who was not covered by

20

any such agreement. According to the defendants, the audio recording of the Garske meeting establishes that Arcanum knew in 2015 about Sater's taking proceeds from the Tri-County Mall investment and that, because Arcanum was an agent of the plaintiffs, that knowledge should be imputed to the plaintiffs.

However, what was said at the Garske meeting is very much in dispute. See Pltfs. 56.1 ¶¶ 21, 25-30; Defs. 56.1 ¶¶ 21, 25-30. Moreover, the plaintiffs argue that any knowledge that Arcanum learned about Sater from this meeting is excepted from the general rule that an agent's knowledge be imputed to the principal, see, e.g., Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994), because the Arcanum NDA imposed a duty on Arcanum not to disclose Sater's identity and not to proffer Sater as a witness to the plaintiffs. That said, whether Arcanum's contractual duty not to disclose Sater's identity to the plaintiffs is enough to prove that any knowledge properly imputed from Arcanum to the plaintiffs did not give the plaintiffs notice of their claims against Sater in 2015 will turn on what exactly Sater disclosed to Garske in the Garske meeting—which is currently disputed. The Arcanum NDA prohibited Arcanum from disclosing "the identities of Litco's members, or other persons having ownership interests in Litco," to the plaintiffs. Arcanum NDA ¶¶ 1-2 (emphasis added). If Sater did in fact disclose information about the Tri-County Mall scheme to Arcanum during the Garske meeting, there

21

is at least a question of fact about whether Arcanum would have followed up on the information Sater disclosed and whether any subsequent knowledge developed by Arcanum—and imputed to the plaintiffs—would have been sufficient to put the plaintiffs on notice of their claims against Sater, even if, pursuant to the Arcanum NDA, Arcanum could not disclose Sater's identity to the plaintiffs.

Accordingly, whether the plaintiffs could have uncovered their claims against the defendants based on the 2015 Garske meeting is a disputed question of fact.

### 3.

Third, the defendants argue that the Crossclaims asserted by the plaintiffs in October 2015 in the Triadou Action demonstrated the plaintiffs' knowledge of their claims against the defendants.

The defendants claim that Sater and Wolf "worked with Arcanum to research and draft the factual allegations of the Crossclaims . . . filed by Boies Schiller on behalf of the Plaintiffs." Defs. 56.1 ¶ 31. But this fact is disputed, especially to the extent that it can be interpreted to suggest that Sater at some point provided information directly to Boies Schiller. See Pltfs. 56.1 ¶ 31 (pointing to evidence that Sater did not provide input on the Crossclaims directly to the

22

SPA-74

plaintiffs and that any information provided to Arcanum regarding the Crossclaims went through Wolf).

More importantly, nothing in the Crossclaims was related to the claims in this case. The Crossclaims focused on the Flatotel investment—a transaction that is not at issue in this case—and did not mention the Tri-County Mall or any of the four other projects relevant to the claims against Sater. Therefore, the Crossclaims cannot establish as a matter of law that, as of October 2015, the plaintiffs should have had knowledge of the facts underlying the claims in this case.

In sum, none of the three events cited by the defendants precludes the application of equitable estoppel as a matter of law. Accordingly, the defendants' motion for summary judgment is **denied.**

**IV.**

The defendants have also moved to disqualify Boies Schiller as trial counsel based on the alleged "personal involvement of Matthew Schwartz in the underlying facts" in this case, citing the advocate-witness rule. Defs. Br. at 17. Schwartz represents the plaintiffs in this case and also represented the plaintiffs in the <u>Triadou</u> Action.

**A.**

The plaintiffs contend that the defendants have waived the right to seek disqualification because the defendants failed to

23

disclose Schwartz as a potential witness under Federal Rule of Civil Procedure 26 and because the motion is untimely.

Rule 26 requires each party to "provide to the other parties . . . the name and . . . the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). Each party is also required to supplement its Rule 26(a) disclosures "in a timely manner." Fed. R. Civ. P. 26(e)(1).

"If a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Substantial justification" means "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." Preuss v. Kolmar Laboratories, Inc., 970 F. Supp. 2d 171, 175 (S.D.N.Y. 2013). A party's failure to comply with Rule 26(a) or (e) "is harmless when there is no prejudice to the party entitled to the disclosure." Am. Stock Exch., LLC v. Mopex, Inc., 215 F.R.D. 87, 93 (S.D.N.Y. 2002).

24

In this case, the defendants have failed to provide any justification at all—let alone a substantial one—for their failure to identify Schwartz as a witness in a timely manner. See id. at 95–96 (finding that the defendant "failed to sustain its burden of demonstrating substantial justification because it offers no viable explanation for why it waited until one month after the close of discovery" to supplement its discovery responses). The defendants had ample opportunity to disclose Schwartz as a witness: they have known about Schwartz's representation of the plaintiffs since 2015 at the latest, when Sater allegedly assisted with the drafting of the Crossclaims filed by Boies Schiller on behalf of the plaintiffs in the Triadou Action. Moreover, equitable estoppel has been an issue in this case from the outset. See City of Almaty, 503 F. Supp. 3d at 66–68.

Furthermore, the defendants have failed to show that this late-breaking identification of Schwartz as a witness would be harmless. In fact, the opposite is true: the plaintiffs would plainly be prejudiced if the defendants were to call Schwartz as a witness on the eve of trial in this long-running suit, especially when the defendants could have disclosed their intent to seek his testimony years ago.

25

Therefore, as a sanction under Rule 37(c)(1), the defendants are precluded from calling Schwartz as a witness at trial, obviating any need to disqualify him or Boies Schiller.

On a related note, the defendants' extreme delay in seeking disqualification smacks of tactical maneuvering, which further supports denying the motion. See Universal City Studios, Inc. v. Reimerdes, 98 F. Supp. 2d 449, 455–56 (S.D.N.Y. 2000) (denying motion because, among other things, the motion was "motivated at least partly by tactical considerations"). As explained above, for at least a decade, the defendants have been aware of Schwartz's and Boies Schiller's representation of the plaintiffs and Schwartz's alleged knowledge of the facts underlying this action. This litigation has been underway for six years, and only now—on the eve of the second trial—have the defendants moved to disqualify Schwartz and Boies Schiller.

**B.**

Moreover, the defendants have failed to demonstrate that disqualification is required. The party seeking disqualification "carries the burden to show both the necessity of the testimony and the substantial likelihood of prejudice." United States v. Tate & Lyle N. Am. Sugars, Inc., 184 F. Supp. 2d 344, 346 (S.D.N.Y. 2002).

The defendants have not shown that Schwartz's testimony is necessary. It is not enough that the testimony "may be relevant

26

and even highly useful"; it must be "strictly necessary." Stratavest Ltd. v. Rogers, 903 F. Supp. 663, 667 (S.D.N.Y. 1995). Accordingly, a lawyer's testimony is "necessary only if there are no other witnesses to the circumstances at issue." Solow v. Conseco, Inc., No. 06-cv-5988, 2007 WL 1599151, at *4 (S.D.N.Y. June 4, 2007); see also Shabbir v. Pakistan Int'l Airlines, 443 F. Supp. 2d 299, 308 (E.D.N.Y. 2005) ("[A] lawyer who could provide only cumulative testimony may act as trial counsel.").

Schwartz's testimony regarding what the plaintiffs may or may not have known about Sater's involvement in the five schemes at issue in this case would likely be relevant. However, there is no showing that this information is solely in Schwartz's possession: the defendants represent that they intend to call four other witnesses to testify on the same issues. See Defs. Br. at 17 n.5. Therefore, the defendants have failed to meet their burden to demonstrate necessity. See Capponi, 772 F. Supp. 2d at 472 (finding the witness's testimony not strictly necessary where the information that the plaintiff intended to solicit from the witness "may be readily available from other sources").

Nor have the defendants established that Schwartz's testimony would prejudice the plaintiffs. To be prejudicial, an attorney's testimony must be "sufficiently adverse to the

27

factual assertions or account of events offered on behalf of the client, such that the client might have an interest in the lawyer's independence in discrediting that testimony." Paramount Commc'ns, Inc. v. Donaghy, 858 F. Supp. 391, 395 (S.D.N.Y. 1994). "The more speculative the potential prejudice, the less likely a court will be to grant a motion to disqualify." Shabbir, 443 F. Supp. 2d at 308. In this case, the defendants claim that Schwartz's testimony would establish that Schwartz "worked closely" with Sater and Arcanum in preparing the October 2015 Crossclaims, and that Schwartz, Boies Schiller, and the plaintiffs had every opportunity to learn about the 2013 Lawsuit and other key facts before the statute of limitations had run. Defs. Br. at 17. But the plaintiffs dispute the defendants' account, and in any event the defendants' proffer of what Schwartz's testimony would show is speculative at this point. "Speculation as to the testimony that counsel would give is not sufficient to support a motion to disqualify." Finkel, 740 F. Supp. 2d at 376; see also Paramount Commc'ns, 858 F. Supp. at 398 ("The conjuring of 'perhaps possible' scenarios is inadequate grounds for a demonstration . . . that such testimony would be prejudicial.").

28

For these reasons, the defendants' motion to disqualify Schwartz and Boies Schiller as trial counsel is **denied**.[6]

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the reasons explained above, the defendants' motion for summary judgment is **denied**. The defendants' motion to disqualify Boies Schiller as trial counsel is also **denied**.

The Clerk is respectfully directed to close ECF No. 733.

SO ORDERED.

Dated:    New York, New York
          August 6, 2025

_____
John G. Koeltl
United States District Judge

---

[6] To the extent that the defendants seek to disqualify the entire firm of Boies Schiller, that request is also without merit. "A law firm can be disqualified by imputation only if the movant proves by clear and convincing evidence that [A] the witness will provide testimony prejudicial to the client, and [B] the integrity of the judicial system will suffer as a result." Murray v. Metro. Life Ins. Co., 583 F.3d 173, 178-79 (2d Cir. 2009). As explained above, the defendants have failed to show that Schwartz's testimony would be prejudicial to the plaintiffs. Moreover, the defendants have made no attempt to demonstrate that "the integrity of the judicial system" would be compromised if Schwartz were to testify and Boies Schiller were to continue to represent the plaintiffs. Id. at 179.

29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITY OF ALMATY, KAZAKHSTAN, ET AL.,

                  Plaintiffs,            19-cv-2645 (JGK)

      - against -             ORDER

FELIX SATER, ET AL.,

                  Defendants.

---

JOHN G. KOELTL, District Judge:

The plaintiffs have filed motion <u>in limine</u> Number 1 and an omnibus motion <u>in limine</u>. Motion <u>in limine</u> Number 1 seeks to preclude the Sater defendants and MeM from offering various categories of evidence related to Litco. The omnibus motion <u>in limine</u> comprises the plaintiffs' motions <u>in limine</u> Numbers 2 through 5.

I.

The plaintiffs' motion <u>in limine</u> Number 1 seeks to preclude: (1) evidence of meetings between Arcanum and Litco or Sater after Arcanum signed a non-disclosure agreement; (2) testimony concerning alleged statements by Nicolas Bourg to representatives of the plaintiffs; (3) evidence of the alleged assistance that Litco provided to the plaintiffs; and (4) evidence regarding the plaintiffs' motives for filing this lawsuit.

A.

First, the plaintiffs move to preclude evidence of meetings between Arcanum and Litco or Sater after Arcanum signed a non-disclosure agreement. This would include evidence of a meeting in July 2015 between Sater and Peder Garske of Arcanum.

Arcanum had been hired by the plaintiffs to conduct asset recovery research. The plaintiffs, Arcanum, and Litco entered into a Confidential Assistance Agreement (the "CAA") dated June 12, 2015. Under the CAA, Litco agreed to provide assistance to Arcanum, "as agent to Kazakhstan, Almaty and BTA," in Arcanum's investigative and asset recovery efforts with respect to the funds that had been stolen from the plaintiffs. Ex. 1 to Schwartz Decl., ECF No. 731-1. Thereafter, Litco secured a Confidentiality and Non-Disclosure Agreement (the "NDA") from Arcanum dated July 8, 2025, which prohibited Arcanum from disclosing to anyone, including the plaintiffs and the plaintiffs' counsel, certain confidential information—namely, "the identities of Litco's members, or other persons having ownership interests in Litco." Ex. 2 to Schwartz Decl., ECF No. 731-2. The NDA also prohibited Arcanum from proffering any person with an ownership interest in Litco as a potential witness in any action contemplated by the CAA. Id.

The plaintiffs argue that the effect of this NDA was to prevent Arcanum from disclosing, and the plaintiffs from

2

SPA-83

learning, that Sater was the owner of Litco. Although the knowledge of an agent is ordinarily attributed to its principals, see, e.g., Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994), the plaintiffs contend that, in this case, that rule does not apply to attribute Arcanum's knowledge to its principals—namely BTA and Almaty—because Arcanum had the conflicting duty not to disclose any information about Sater's ownership of Litco or to produce Sater as a witness, see Restatement (Third) of Agency § 5.03 (A.L.I. 2006). That is significant, because the defendants claim that Litco produced Sater as a source of significant information for Arcanum, including information about the Tri-County Mall transaction, in the July 2015 meeting between Sater and Garske. The defendants argue that this shows that the plaintiffs had knowledge of the Tri-County Mall transaction, and Sater's role in diverting the proceeds from that transaction, at least as early as July 2015, and that this defeats the application of equitable estoppel. The plaintiffs respond that this is irrelevant because Arcanum's knowledge is not attributable to the plaintiffs in view of Arcanum's obligation under the NDA not to disclose Sater's identity. The plaintiffs contend, therefore, that all of the information about Litco's meetings with Arcanum after the NDA was signed should be excluded. The defendants do not respond to the argument that the

3

NDA precludes a finding that Arcanum's knowledge is attributable to the plaintiffs.

But the plaintiff's argument about the NDA does not make the evidence with respect to Litco and the meeting between Sater and Garske irrelevant to the issue of equitable estoppel. While Arcanum's knowledge of Sater's identity is not automatically attributable to the plaintiffs, that leaves the question what Arcanum did in pursuing any other information received from Sater, including any information with respect to the Tri-County Mall transaction if, indeed, Sater explained the Tri-County Mall transaction to Garske. That will depend on what the evidence shows with respect to what, if anything, Arcanum did with that information. To the extent that Arcanum learned anything from subsequently following up on the information received from Sater, that knowledge could be imputed to the plaintiffs if not covered by the NDA.

The Court could not find that the evidence is irrelevant to whether the plaintiffs discovered, or with the exercise of due diligence should have discovered, information about the Tri-County Mall transaction within the statute of limitations.

On the other hand, the evidence of the NDA itself is relevant to the defense of equitable estoppel from the plaintiffs' standpoint, because it could be used as evidence

that Sater sought to prevent his role in the Tri-County Mall transaction from being discovered.

These are questions for the jury. The Court could not exclude evidence of Litco's meetings with Arcanum after the NDA was signed on a motion in limine, nor should the Court prevent disclosure of what Sater allegedly told Garske in the meeting in July 2015. Therefore, the motion to exclude evidence of meetings between Arcanum and Litco or Sater after Arcanum signed the NDA is **denied**.

**B.**

Second, the plaintiffs move to preclude alleged statements by Bourg to representatives of the plaintiffs as hearsay. It is not clear precisely which statements are referred to in this part of the motion, and the defendants did not respond to this specific part of the motion at all in the opposition.

The basic rules of hearsay are clear. If there is out-of-court testimony about what Bourg allegedly told the plaintiffs, that would be hearsay and excluded if it is a third party recounting what Bourg told the plaintiffs and is offered for the truth of the alleged fact of what Bourg told the plaintiffs. See Fed. R. Evid. 801, 802. However, if Bourg testifies what he told the plaintiffs about the Tri-County Mall, that is not hearsay because it is not being offered for the truth, but rather for the fact that the plaintiffs obtained the knowledge of what

Bourg was saying, irrespective of whether it is true or not. Hearsay statements would be precluded, but non-hearsay statements would not be excluded. Accordingly, this portion of the motion in limine is **denied** without prejudice to the ability of the plaintiffs to object to the admissibility of specific statements at trial.

### C.

Third, the plaintiffs seek to exclude evidence of the purported assistance provided by Litco to the plaintiffs. The defendants do not address this issue in their opposition. To the extent that the assistance Litco provided was information about one of the transactions at issue in this case, it should not be excluded, and therefore the motion in limine is **denied** in that respect.

### D.

Fourth, the plaintiffs seek to preclude any evidence of the plaintiffs' alleged motives in bringing this case. The defendants appear to concede that they will not offer such evidence, and therefore they are **precluded** from offering such evidence.

### E.

In passing, the defendants assert that they will offer evidence of what was communicated to the plaintiffs' counsel in November 2016. See ECF No. 749 at 6. But it is unclear what

6

evidence is being referred to, and the plaintiffs represent that there are no exhibits on the defendants' exhibit list that refer to any such meeting. It is impossible to rule on the admissibility of evidence of any such meeting without further information.

II.

The plaintiffs' omnibus motion in limine contains motions in limine Numbers 2 through 5, to which the defendants have largely failed to respond.

A.

In motion in limine Number 2, the plaintiffs seek to admit deposition and trial testimony from the related Triadou case and the first trial in this case. The plaintiffs argue that this testimony is admissible under Federal Rule of Evidence 804(b)(1) on the grounds that the various witnesses are unavailable and the parties with the same interests as the defendants had an opportunity and similar motive to examine the witnesses.

The plaintiffs have established that each of these witnesses is unavailable. Of the fourteen witnesses from the Triadou case whose testimony the plaintiffs seek to admit, one is dead, and the plaintiffs have been unable to secure the attendance of the remaining witnesses for trial. Therefore, the testimony of the witnesses from the Triadou case is admissible under Federal Rule of Evidence 804(b)(1). Similarly, there are

7

several witnesses who testified at the first trial in this case who are now unavailable. And there is no dispute that the defendants had a prior opportunity and similar motive to examine these witnesses. The testimony of these witnesses is similarly admissible under Federal Rule of Evidence 804(b)(1).

The only objection raised by the defendants is that the testimony of these witnesses is unnecessary because the only issue to be tried is the defense of equitable estoppel, and particularly whether the plaintiffs acted with reasonable diligence. But that is plainly wrong. At the new trial, the plaintiffs have the obligation to prove that the defendants committed the torts of which they are accused, namely conversion for Sater and unjust enrichment for the Sater defendants and MeM. In addition, the plaintiffs have the burden of proving equitable estoppel to preclude the defense of the statute of limitations, which would require a showing that the trial defendants' "fraud, misrepresentation, or deception" prevented the plaintiffs from filing this action. See ECF No. 711 at 10.

It is unquestionably true that much of the plaintiffs' case showing that the funds that were eventually traced to the defendants in this case were stolen from the plaintiffs could be the subject of reasonable stipulations by reasonable attorneys, and the trial could be expedited and focus on equitable estoppel. But no such reasonable efforts have been forthcoming

8

from the parties in this case. Therefore, the Court could not foreclose the plaintiffs from putting on the necessary evidence to prove their claims.

The motion to admit the deposition and trial testimony from the Triadou case and the prior trial in this case is **granted**.

### B.

In motion in limine Number 3, the plaintiffs move to preclude evidence and argument of alleged persecution by non-parties of non-parties. This motion is unopposed. Therefore, the motion is **granted.** The parties should not refer to alleged political persecution by non-parties of non-parties. This instruction applies to all parties in this case.

### C.

In motion in limine Number 4, the plaintiffs seek to admit evidence of Sater's prior conviction for violation of RICO. For all of the reasons that the Court found that this conviction was properly admitted under Federal Rule of Evidence 404(b) in the first trial, it is similarly admissible in this trial. Trial Tr. at 229-32, ECF No. 655. The defendants fail to explain why the Court's prior ruling was incorrect. Similarly, the prior conviction would be admissible to impeach Sater under Federal Rule of Evidence 609, see id. at 232-34, and the defendants fail to explain why the Court's prior ruling was incorrect. Accordingly, the plaintiffs' motion is **granted.**

9

The plaintiffs also seek to preclude the defendants from introducing evidence of Sater's prior good acts, including his alleged good conduct in assisting the United States Government in various endeavors. The defendants appear to agree, arguing that "[w]hether Felix Sater is a good guy or a bad guy is irrelevant." ECF No. 750 at 2. The admissibility of prior good acts is disfavored under the Federal Rules of Evidence. See Fed. R. Evid. 608(b). Therefore, before attempting to introduce any evidence of Sater's alleged prior good acts, including any work for the United States Government, the defendants are ordered to raise the issue with the Court outside the presence of the jury and explain why the evidence is admissible under the Federal Rules of Evidence.

### D.

In motion in limine Number 5, the plaintiffs seek to prevent any evidence or argument as to Mendel Mochkin's character or character traits. There is no opposition to this motion, and the motion is **granted**. In the first trial, counsel for MeM engaged in plainly improper appeals to prejudice and sympathy by relying on, among other things, Mochkin's religion and attempting to compare his New York roots to the non-United States citizenship of the plaintiffs. The defendants are ordered not to repeat those tactics in the upcoming trial.

10

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the reasons explained above, the plaintiffs' motion in limine Number 1 is **granted in part and denied in part**, and the plaintiffs' motions in limine Numbers 2–5 are **granted**.

The Clerk is respectfully directed to close ECF Nos. 727 and 729.

The conference scheduled for September 3, 2025 (ECF No. 760) is **canceled**.

**SO ORDERED.**

Dated:    New York, New York
          August 6, 2025

_____
              John G. Koeltl
          **United States District Judge**

11

SPA-92

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────
CITY OF ALMATY, ET AL.,
                        Plaintiffs,        19-cv-2645 (JGK)

            - against -                    MEMORANDUM OPINION
                                           AND ORDER
FELIX SATER, ET AL.,
                        Defendants.
─────────────────────────────────────
```

**JOHN G. KOELTL, District Judge:**

The plaintiffs, the City of Almaty, Kazakhstan ("Almaty"), and BTA Bank JSC ("BTA"), move by order to show cause for the entry of a default judgment against defendant Ferrari Holdings LLC ("Ferrari") in the amount of $540,000. ECF Nos. 797-98. For the reasons that follow, the plaintiffs are entitled to default judgment in the amount of $540,000, plus pre-judgment and post-judgment interest.

**I.**

The Court assumes familiarity with the history of this case, which has been described in previous opinions. See, e.g., ECF Nos. 244, 323, 392, 296, 625, 673. The following summary sets forth only those facts necessary to contextualize the ruling on the plaintiff's motion for a default judgment.

The plaintiffs brought this case on March 25, 2019. The plaintiffs allege that Victor Khrapunov, the former mayor of Almaty, misappropriated funds from Almaty through fraudulent means. Second Amended Complaint ("SAC") ¶ 53-62, ECF No. 399.

The plaintiffs also contend that Mukhtar Ablyazov ("Ablyazov"), the former chairman and controlling shareholder of BTA, misappropriated funds from BTA by causing BTA to make fraudulent loans to companies controlled by Ablyazov. Id. ¶¶ 16-49. According to the plaintiffs, the funds stolen from BTA were then mixed and laundered throughout the world by Ablyazov and Ilyas Khrapunov, Victor Khrapunov's son and Ablyazov's son-in-law. Id. ¶¶ 50-52. Similarly, the funds stolen from Almaty were laundered with the aid of Ablyazov through his control of BTA. Id. ¶ 57.

The plaintiffs brought claims against various defendants, including Ferrari. As alleged in the First Amended Complaint,[1] Ferrari participated in a scheme with the other defendants to launder tens of millions of dollars of the plaintiffs' funds in connection with the purchase of the Tri-County Mall note. First Amended Complaint ("FAC") ¶¶ 230-33, 299(e), ECF No. 120.

With this background in mind, the Court makes the following findings of fact.[2]

---

[1] Following the withdrawal of Ferrari's counsel and the subsequent certificate of default, the plaintiffs filed the SAC. ECF No. 399. The allegations and claimed damages against Ferrari are the same in the FAC and SAC.

[2] "On a default judgment motion, the defendant is deemed to have admitted all of the well-pleaded factual allegations contained in the complaint." Tropica Fresh v. Mr. G Int'l Produce Inc., No. 20-cv-748, 2020 WL 3440120, at *2 (S.D.N.Y. June 23, 2020).

**A.**

Ferrari knowingly agreed to help defendant Felix Sater ("Sater") launder funds stolen from the plaintiffs, and Ferrari profited directly from the scheme. In April 2013, in a deal handled by Sater and defendant Daniel Ridloff ("Ridloff"), under Ilyas Khrapunov's direction, a company beneficially owned by Ilyas Khrapunov won an auction to acquire an investment in a note related to the Tri-County Mall in Ohio for approximately $30 million. FAC ¶ 220. Telford International Limited ("Telford"), a company controlled by Ilyas Khrapunov and funded with money stolen from the plaintiffs, provided funding for the acquisition. FAC ¶¶ 222, 230; see also PTX-376, ECF No. 798-1. Ferrari earned $1,080,000 as a purported "finder's fee" in relation to the Tri-County Mall transaction. FAC ¶ 230. Ferrari kept half of that amount, or $540,000, and transferred the remaining half to an entity controlled by Ridloff. Id. ¶¶ 231-32; see also PTX-376; PTX-572, ECF No. 798-2.

Although the $1,080,000 payment to Ferrari purported to be a finder's fee in connection with the Tri-County Mall transaction, it was not. Ferrari was not identified as a broker in connection with the transaction, had no interactions with the real estate advisor on the transaction, and was not involved in negotiating the terms or the financing of the acquisition. FAC

3

¶¶ 136-38, 239-240. Ferrari knowingly participated in the scheme to launder funds stolen from the plaintiffs. See ECF No. 798-3.

**B.**

The plaintiffs filed this action on March 25, 2019. See ECF No. 1. Ferrari was properly served with the summons and complaint on April 11, 2019. ECF No. 25. Ferrari originally appeared through counsel, Archer & Greiner, P.C. ("Archer & Greiner"), see, e.g., ECF Nos. 21, 37, but Archer & Greiner subsequently sought to withdraw, citing a "breakdown in communication," ECF Nos. 162, 169-1. On April 9, 2020, Magistrate Judge Parker granted Archer & Greiner's motion to withdraw as Ferrari's counsel. ECF No. 181. Magistrate Judge Parker also ordered Ferrari to retain new counsel within sixty days of that order. Id. Ferrari has never requested an extension, and no other counsel has appeared on Ferrari's behalf. See, e.g., ECF No. 200.

On July 16, 2020, the Clerk issued a Certificate of Default against Ferrari. ECF No. 207. On January 15, 2021, the plaintiffs filed their first motion for a default judgment as to Ferrari. See ECF Nos. 269-270, 272, 314. Ferrari did not oppose the motion or otherwise make an appearance. The Court deferred a decision on the plaintiffs' first motion for a default judgment until their claims against the other defendants were resolved. ECF No. 315. In June 2024, the plaintiffs and defendants Daniel

4

Ridloff and RRMI-DR reached a settlement. The plaintiffs and the remaining non-defaulting defendants proceeded to trial on the plaintiff's claims for conversion, money had and received, and unjust enrichment on June 10, 2024; the jury returned a verdict for the plaintiffs on all three claims. See June 26, 2024, Minute Entry. On January 16, 2025, the Court granted the trial defendants' motion for a new trial on the conversion and unjust enrichment claims and held that the damages award from the June 2024 trial on the money had and received claim remained valid. See ECF No. 702. On September 29, 2025, the plaintiffs and the non-defaulting defendants proceeded to a second trial on the conversion and unjust enrichment claims; the jury once again returned a verdict for the plaintiffs on these claims. See Oct. 20, 2025, Minute Entry.

On October 30, 2025, the plaintiffs again moved for a default judgment against Ferrari. ECF No. 797. On November 3, 2025, the Court ordered Ferrari to show cause why a default judgment should not be entered pursuant to Federal Rule of Civil Procedure 55. ECF No. 800. The plaintiffs served Ferrari with notice of the order to show cause on November 5, 2025. ECF Nos. 803-04. Ferrari did not respond.

## II.

In determining whether to grant a default judgment, a court considers "(1) whether the defendant's default was willful;

(2) whether [the] defendant has a meritorious defense to [the] plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment."[3] Mason Tenders Dist. Council v. Duce Constr. Corp., No. 02-cv-9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003). Because on a default judgment motion, the defendant is deemed to have admitted all of the well-pleaded factual allegations contained in the complaint, the Court "must accept as true all of the factual allegations of the non-defaulting party and draw all reasonable inferences in its favor." Tropica Fresh, 2020 WL 3440120, at *2.

### A.

As described above, Magistrate Judge Parker ordered Ferrari to obtain new counsel following the withdrawal of Archer & Greiner, ECF No. 181. Ferrari was aware of its obligation to obtain new counsel, but Ferrari failed to do so. See ECF Nos. 797-4, 797-5, 797-6, 246, 280. Ferrari's default was therefore willful. See, e.g., Grace v. Bank Leumi Trust Co. of N.Y., 443 F.3d 180, 192 (2d Cir. 2006) ("[I]t is settled law that a corporation may not appear in a lawsuit against it except through an attorney, and that, where a corporation repeatedly fails to appear by counsel, a default judgment may be entered

---

[3] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

against it pursuant to Rule 55."); Golden Ins. Co. v. PCF State Restoration, Inc., No. 17-cv-5390, 2020 WL 635533, at *2 (S.D.N.Y. Feb. 11, 2020) ("[The defendant's] failure to appear in this action through new counsel, despite having ample opportunity and clear direction from the Court to do so, is indicative of willful conduct.").

## B.

Ferrari is liable to the plaintiffs for unjust enrichment and money had and received and does not have any meritorious defenses to those claims. Claims for money had and received and unjust enrichment lie where a defendant knowingly receives wrongfully obtained property. See Middle E. Banking Co. v. State St. Bank Int'l, 821 F.2d 897, 906 (2d Cir. 1987) (money had and received depends on the defendant receiving money belonging to the plaintiff and that the defendant benefitted from the receipt of that money); Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1110 (N.Y. 2011) (unjust enrichment requires the plaintiff to prove that the defendant was enriched at the plaintiff's expense). As established by the well-pleaded allegations in the FAC, Ferrari knowingly helped the other defendants launder funds stolen from the plaintiffs and retained $540,000 in exchange for doing so. See FAC ¶¶ 237-40. Ferrari's only attempt to present a defense in this action was filing a motion to dismiss, which was administratively denied when Ferrari failed to retain new

counsel. <u>See</u> ECF No. 245. Therefore, Ferrari has abandoned its motion to dismiss and any other defenses it may have had. <u>See</u> <u>Intrepidus, LLC v. Bivins</u>, No. 15-cv-7721, 2017 WL 1608896, at *3 (S.D.N.Y. Apr. 28, 2017).

### C.

With respect to prejudice, a court "may presume that the non-defaulting party has been prejudiced by the defaulting party's failure to defend their actions and prosecute their claim." <u>Mister Softee, Inc. v. Tsirkos</u>, No. 14-cv-1975, 2015 WL 7458619, at *3 (S.D.N.Y. Nov. 23, 2015).

\* \* \*

For the foregoing reasons, the plaintiffs are entitled to a default judgment against Ferrari.

### III.

A default judgment entered on well-pleaded allegations in a complaint establishes liability, <u>Bambu Sales, Inc. v. Ozak Trading, Inc.</u>, 58 F.3d 849, 854 (2d Cir. 1995), but it does not reach the issue of damages, <u>see</u> <u>Ferri v. Berkowitz</u>, 561 F. App'x 64, 65 (2d Cir. 2014) (summary order). Therefore, a plaintiff must substantiate its claim with sufficient evidence to prove its damages with reasonable certainty. "[A] hearing is not necessary as long as there is a basis for the damages specified in the default judgment." <u>Tropica Fresh</u>, 2020 WL 3440120, at *4.

SPA-100

The record from the second trial establishes that Ferrari retained $540,000 in funds wrongfully taken from the plaintiffs. See PTX-376; PTX-572. Ferrari obtained that $540,000 on May 24, 2013. PTX-572. The plaintiffs are accordingly entitled to a default judgment of $540,000 on their money had and received and unjust enrichment claims. The plaintiffs are also entitled to pre-judgment interest at the statutory rate of 9% per year running from May 24, 2013, until entry of judgment. See N.Y. C.P.L.R. §§ 5001, 5004.

## CONCLUSION

For the foregoing reasons, the plaintiffs are entitled to a default judgment against Ferrari in the amount of $540,000 on the plaintiff's money had and received and unjust enrichment claims. Therefore, the Clerk is respectfully requested to enter judgment as follows:

(1)  A default judgment in favor of the plaintiffs against Ferrari in the amount of $540,000.

(2)  Pre-judgment interest at the statutory rate of 9% running from May 24, 2013, until the entry of judgment.

(3)  Post-judgment interest at the statutory rate. 28 U.S.C. § 1961.

The Clerk should enter this judgment on the same day as the judgment against the remaining defendants so that all judgments are final and the case is closed.

SO ORDERED.
Dated:    New York, New York
          February 27, 2026

_____
         John G. Koeltl
    United States District Judge

10

SPA-102

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

               Plaintiffs,

    -against-

FELIX SATER, DANIEL RIDLOFF, BAYROCK
GROUP INC., GLOBAL HABITAT SOLUTIONS
INC., RRMI-DR LLC, FERRARI HOLDINGS
LLC, and MEM ENERGY PARTNERS LLC,

               Defendants.

No. 19 Civ. 2645 (JGK) (KHP)

[PROPOSED] **JUDGMENT**

WHEREAS, on June 10, 2024, a jury trial was held between Plaintiffs the City of Almaty, Kazakhstan and BTA Bank JSC (collectively, the "Plaintiffs"), appearing by their attorneys at Boies Schiller Flexner LLP, and Defendants Felix Sater ("Sater"), Bayrock Group Inc. ("Bayrock"), Global Habitat Solutions Inc. ("GHS"), and MeM Energy Partners LLC ("MeM") (collectively, the "Defendants") appearing by attorneys at John H. Snyder PLLC, the Law Firm of Thomas C. Sima, and Kombol Law Group, P.C., in the United States District Court for the Southern District of New York before the Honorable John G. Koeltl (the "First Trial");

WHEREAS, a jury of nine persons was regularly impaneled and sworn (the "First Jury"), and the trial proceeded on three causes of action in Plaintiffs' Second Amended Complaint for (1) Conversion against Defendant Sater, (2) Unjust Enrichment against all Defendants, and (3) Money Had and Received against all Defendants;

WHEREAS, after hearing the evidence and arguments of counsel the First Jury was duly instructed by the Court on Plaintiffs' claims for Conversion, Unjust Enrichment, and Money Had and Received. The First Jury deliberated and thereafter returned to Court on June 26, 2024, with

its verdict in favor of Plaintiffs on its claims for Conversion against Defendant Sater, Unjust Enrichment against all Defendants, and Money Had and Received against all Defendants (the "First Verdict");

WHEREAS, on January 16, 2025, the Court granted Defendants' motion pursuant to Fed. R. Civ. P. 59(a)(1)(A) for a new trial on Plaintiffs' claims of conversion and unjust enrichment, and held that the First Jury's verdict and damages award on Plaintiffs' claim of money had and received remains valid, [ECF No. 702];

WHEREAS, on September 29, 2025, a jury trial was held between Plaintiffs, appearing by their attorneys at Boies Schiller Flexner LLP, and Defendants, appearing by attorneys at John H. Snyder PLLC, the Law Firm of Thomas C. Sima, and Kombol Law Group, P.C., in the United States District Court for the Southern District of New York before the Honorable John G. Koeltl (the "Second Trial");

WHEREAS, a jury of ten persons was regularly impaneled and sworn (the "Second Jury"), and the trial proceeded on the two remaining causes of action in Plaintiffs' Second Amended Complaint for (1) Conversion against Defendant Sater, and (2) Unjust Enrichment against all Defendants;

WHEREAS, after hearing the evidence and arguments of counsel the Second Jury was duly instructed by the Court on Plaintiffs' claims for Conversion and Unjust Enrichment. The Second Jury deliberated and thereafter returned to Court on October 10, 2025, with its verdict in favor of Plaintiffs on its claims for Conversion against Defendant Sater and Unjust Enrichment against all Defendants (the "Second Verdict");

WHEREAS, the Court has considered all evidence submitted to it at the First Trial, the Second Trial, and otherwise.

**NOW THEREFORE, IT IS ORDRED, ADJUDGED AND DECREED** that:

1.      Judgment shall be entered in favor of Plaintiffs, and against Defendant Felix Sater, on their claim of Conversion, in the amount of $26,221,387.00 in principal.  Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum from April 2, 2013, which was the earliest ascertainable date that Plaintiffs had a claim for Conversion, amounting to $29,670,397.38 in prejudgment interest through October 24, 2025, plus $6,465.54  per day until this Judgment is rendered.  *See* New York Civil Law and Rules ("CPLR") § 5004.  Prejudgment interest is awarded on Plaintiffs' claim for Conversion in the amount of $30,485,055.22 .  Plaintiffs are further entitled to punitive damages for their claim of Conversion against Defendant Sater in the total amount of $3,000,000.00;

2.      Judgment shall be entered in favor of Plaintiffs, and against all Defendants, on their claim of Unjust Enrichment, for which the Defendants are jointly and severally liable.  Plaintiffs shall have and recover from each Defendant damages for Unjust Enrichment as follows:

    a.      From Defendant Felix Sater, $16,083,426.67 in principal.  Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum from April 2, 2013, which was the earliest ascertainable date that Plaintiffs had a claim for Unjust Enrichment against Defendant Sater, amounting to $18,198,948.07 in prejudgment interest through October 24, 2025, plus $3,965.77 per day until this Judgment is rendered.  *See* CPLR § 5004. Prejudgment interest is awarded on Plaintiffs' claim for Unjust Enrichment against Defendant Sater in the total amount of $18,698,635.09 ;

    b.      From Defendant Bayrock Group, Inc., $2,031,375.00 in principal. Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum

3

from June 3, 2013, which was the earliest ascertainable date that Plaintiffs had a claim for Unjust Enrichment against Defendant Bayrock, amounting to $2,267,515.38 in prejudgment interest through October 24, 2025, plus $500.88 per day until this Judgment is rendered. *See* CPLR § 5004. Prejudgment interest is awarded on Plaintiffs' claim for Unjust Enrichment against Defendant Bayrock in the total amount of $2,330,626.26 ;

   c. From Defendant Global Habitat Solutions, Inc., $668,930.50 in principal. Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum from April 2, 2013, which was the earliest ascertainable date that Plaintiffs had a claim for Unjust Enrichment against Defendant GHS, amounting to $756,917.76 in prejudgment interest through October 24, 2025, plus $164.94 per day until this Judgment is rendered. *See* CPLR § 5004. Prejudgment interest is awarded on Plaintiffs' claim for Unjust Enrichment against Defendant GHS in the total amount of $777,700.20 ;

   d. From Defendant MeM Energy Partners LLC, $343,051.74 in principal. Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum from August 22, 2013, which was the earliest ascertainable date that Plaintiffs had a claim for Unjust Enrichment against Defendant MeM, amounting to $376,163.28 in prejudgment interest through October 24, 2025, plus $84.58 per day until this Judgment is rendered. *See* CPLR § 5004. Prejudgment interest is awarded on Plaintiffs' claim for Unjust Enrichment against Defendant MeM in the total amount of $386,820.36 ;

4

Case: 26-780, 08/03/2026, DktEntry: 29.1, (161 of 165)

Case 1:19-cv-02645-JGK-KHP    Document 833    Filed 02/27/26    Page 5 of 6
Case 1:19-cv-02645-JGK-KHP    Document 791    Filed 10/24/25    Page 5 of 6

3.    Judgment shall be entered in favor of Plaintiffs, and against all Defendants, on their claim of Money Had and Received, for which the Defendants are jointly and severally liable. Plaintiffs shall have and recover from each Defendant damages for Money Had and Received as follows:

a.    From Defendant Felix Sater, $504,213.33 in principal. Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum from April 2, 2013, which was the earliest ascertainable date that Plaintiffs had a claim for Money Had and Received against Defendant Sater, amounting to $570,534.65 in prejudgment interest through October 24, 2025, plus $124.32 per day until this Judgment is rendered. *See* CPLR § 5004. Prejudgment interest is awarded on Plaintiffs' claim for Money Had and Received against Defendant Sater in the total amount of $586,198.97 _____ ;

b.    From Defendant Bayrock Group, Inc., $2,031,375.00 in principal. Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum from June 3, 2013, which was the earliest ascertainable date that Plaintiffs had a claim for Money Had and Received against Defendant Bayrock, amounting to $2,267,515.38 in prejudgment interest through October 24, 2025, plus $500.88 per day until this Judgment is rendered. *See* CPLR § 5004. Prejudgment interest is awarded on Plaintiffs' claim for Money Had and Received against Defendant Bayrock in the total amount of $2,330,626.26 _____ ;

c.    From Defendant Global Habitat Solutions, Inc., $668,926.50 in principal. Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum from April 2, 2013, which was the earliest ascertainable date that Plaintiffs had

a claim for Money Had and Received against Defendant GHS, amounting to $756,913.24 in prejudgment interest through October 24, 2025, plus $164.94 per day until this Judgment is rendered. *See* CPLR § 5004. Prejudgment interest is awarded on Plaintiffs' claim for Money Had and Received against Defendant GHS in the total amount of $777,695.68 ;

  d.   From Defendant MeM Energy Partners LLC, $343,000.26 in principal. Plaintiffs are further entitled to prejudgment interest at the statutory rate of nine percent per annum from August 22, 2013, which was the earliest ascertainable date that Plaintiffs had a claim for Money Had and Received against Defendant MeM, amounting to $376,106.83 in prejudgment interest through October 24, 2025, plus $84.57 per day until this Judgment is rendered. *See* CPLR § 5004. Prejudgment interest is awarded on Plaintiffs' claim for Money Had and Received against Defendant MeM in the total amount of $386,762.65 .

Date: February 27 , 2026

The Honorable John G. Koeltl
United States District Court Judge

6

# NEW YORK CIVIL PRACTICE LAW AND RULES § 214

Actions to be commenced within three years: for non-payment of money collected on execution; for penalty created by statute; to recover chattel; for injury to property; for personal injury; for malpractice other than medical, dental or podiatric malpractice; to annul a marriage on the ground of fraud. The following actions must be commenced within three years:

1. an action against a sheriff, constable or other officer for the non-payment of money collected upon an execution;

2. an action to recover upon a liability, penalty or forfeiture created or imposed by statute except as provided in sections 213 and 215;

3. an action to recover a chattel or damages for the taking or detaining of a chattel;

4. an action to recover damages for an injury to property except as provided in section 214-c;

5. an action to recover damages for a personal injury except as provided in sections 214-b, 214-c, 214-i and 215;

6. an action to recover damages for malpractice, other than medical, dental or podiatric malpractice, regardless of whether the underlying theory is based in contract or tort; and

7. an action to annul a marriage on the ground of fraud; the time within which the action must be commenced shall be computed from the time the plaintiff discovered the facts constituting the fraud, but if the plaintiff is a person other than the spouse whose consent was obtained by fraud, the time within which the action must be commenced shall be computed from the time, if earlier, that that spouse discovered the facts constituting the fraud.

Civil Practice Law & Rules, Chapter 8, Article 2.

# FEDERAL RULE OF CIVIL PROCEDURE 51

## Instructions to the Jury; Objections; Preserving a Claim of Error

**(a) REQUESTS.**

(1) Before or at the Close of the Evidence. At the close of the evidence or at any earlier reasonable time that the court orders, a party may file and furnish to every other party written requests for the jury instructions it wants the court to give.

(2) After the Close of the Evidence. After the close of the evidence, a party may:

(A) file requests for instructions on issues that could not reasonably have been anticipated by an earlier time that the court set for requests; and

(B) with the court's permission, file untimely requests for instructions on any issue.

**(b) INSTRUCTIONS. The court:**

(1) must inform the parties of its proposed instructions and proposed action on the requests before instructing the jury and before final jury arguments;

(2) must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered; and

(3) may instruct the jury at any time before the jury is discharged.

**(c) OBJECTIONS.**

(1) How to Make. A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection.

(2) When to Make. An objection is timely if:

(A) a party objects at the opportunity provided under Rule 51(b)(2); or

(B) a party was not informed of an instruction or action on a request before that opportunity to object, and the party objects promptly

after learning that the instruction or request will be, or has been, given or refused.

**(d) ASSIGNING ERROR; PLAIN ERROR.**

(1) Assigning Error. A party may assign as error:

    (A) an error in an instruction actually given, if that party properly objected; or

    (B) a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected.

(2) Plain Error. A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights.

Source: Federal Rules of Civil Procedure, Rule 51, as amended through December 1, 2024, published by the Administrative Office of the United States Courts.